**SUN STUDS, INC., Plaintiff–Appellant,**

v.

**ATA EQUIPMENT LEASING, INC., Applied Theory, Inc. and U.S. Natural Resources, Inc., Defendants/Cross–Appellants.**

Nos. 87–1509, 87–1515.

United States Court of Appeals,
Federal Circuit.

March 31, 1989.

Rehearing Denied May 2, 1989.

Supplemental Order July 3, 1989.

Don H. Marmaduke, of Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for plaintiff-appellant. With him on the brief, were Barbee B. Lyon, of Tonkon, Torp, Galen, Marmaduke & Booth and William A. Birdwell, of Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or.

David W. Axelrod, of Schwabe, Williamson & Wyatt, Portland, Or., for defendants/cross-appellants. With him on the brief, was Robert L. Harrington, of Portland, Or.

Before FRIEDMAN and NEWMAN, Circuit Judges, and BENNETT, Senior Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

This appeal and cross-appeal arise from the judgment of the United States District Court for the District of Oregon,[1] on trial to a jury of the multiple and interrelated issues of patent validity, patent infringement, misappropriation of confidential information, breach of contract, and copyright infringement. We affirm in part, reverse in part, and remand.

### Background

The three patents in suit concern processes and apparatus for automated sawmills and veneer mills. Sun Studs, Inc., an Oregon corporation, is the owner of the patents, and operates a sawmill and veneer mill. Applied Theory, Inc. and its related defendant companies ATA Equipment Leasing and U.S. Natural Resources (collectively "Applied Theory") provides various services to the lumber industry and was in 1971, at the start of the events leading to this dispute, a consulting firm of university professors having general experience in computer programming. At that time Applied Theory had no significant experience in the lumber industry.

Before 1971 Sun Studs' president Fred Sohn and a consultant H.C. Mason had developed methods and apparatus for improving the processing of raw logs and increasing the yield of usable products, resulting in the two Mason patents in suit, discussed *infra*. In 1971 Applied Theory was hired to do computer design work on these and related systems. Applied Theory agreed that all information developed, and all inventions and any patents thereon, were the property of Sun Studs. The patent thus obtained is the Sohn '579 patent, also in suit.

These patents cover various processes and apparatus for obtaining the optimal amount of wood products from logs, rapidly and accurately, minimizing wasted wood and operational errors, and thereby maximizing revenues. Sun Studs states that it obtained a fifty percent increase in recovery of wood products. There was testimony that these systems are of industry-wide importance; a witness called them "revolutionary".

By contract in 1971 Applied Theory also agreed that on termination of the consulting project it would preserve the information developed thereunder in confidence for five years, and "shall assist in every lawful way ... in protecting or enforcing Sun Studs' rights [to any resulting patents], and in prosecuting and defending appeals, interferences, infringement suits, and controversies relating thereto". The same agreement appears in a 1973 contract assigning the Sohn '579 patent to Sun Studs. Sun Studs agreed to pay Applied Theory half of any net royalties obtained from

1. *Sun Studs, Inc. v. ATA Equipment Leasing, Inc., Applied Theory, Inc., and U.S. Natural Resources, Inc.,* Civil No. 78–714–RE (D.Or. July 17, 1987), *vacating partial judgment,* 655 F.Supp. 1013 (1987). Related case *Sun Studs, Inc. v. Applied Theory Associates, Inc. and Applied Theory, Inc.,* 772 F.2d 1557, 227 USPQ 81 (Fed.Cir.1985).

licensing any such resulting patents to third persons.

In 1973 Applied Theory began to offer consulting services to other sawmills, and subsequently to other veneer mills, adapting and installing processes and apparatus that the jury found to be the same or substantially the same as those that had been developed for Sun Studs. In 1978 Sun Studs filed suit for patent infringement and breach of contract, leading to the multiple issues of this appeal.

The case was tried in three phases before the same jury. In Phase 1 the jury found all of the patent claims at issue valid, and infringed by some but not all of the accused installations. The jury found that the infringement was not willful.

In Phase 2 the jury found that Applied Theory had breached its contract with Sun Studs by use of the SIMPX computer program, and that Applied Theory had infringed Sun Studs' common law copyright on the SIMPX program. The jury found that Applied Theory had breached its common law confidential relationship with Sun Studs by misappropriation of this program, and that recovery on this common law claim was barred by the Oregon statute of limitations. The jury found that Sun Studs had breached its contractual obligation to pay Applied Theory half of the net royalties it received from licensing of the Sohn '579 patent. The jury also found laches against Sun Studs with respect to recovery of damages for sawmill infringement.

In Phase 3 the jury awarded Sun Studs $710,000 in damages for patent infringement, calculated at a specified royalty per type of mill, and taking account of laches; $10,000 damages for copyright infringement; and $10,000 damages for breach of contract. The jury awarded Applied Theory $309,629.36 as its share of the licensing royalties received by Sun Studs.

The district court granted Applied Theory's motion for judgment n.o.v. on patent infringement, the court adjudging non-infringement by all the accused installations. The court vacated the damage award for patent infringement and the injunction that it had entered on the jury verdicts. The jury's two $10,000 damage awards, for copyright infringement and breach of contract, were held to be for the same breach and were reduced to one $10,000 award. The court also increased to $353,500.00 the share of royalties payable by Sun Studs to Applied Theory, reversing the jury's verdict deducting attorney fee contributions by Sun Studs' licensee in calculating "net" royalties. All other post-trial motions were denied.

Each party appeals the aspects decided adversely to it, except that Applied Theory does not appeal the judgments adverse to it on the common law confidentiality, contract and computer program issues and the damages therefor.

### I
#### Patent Validity

At issue were claims 1, 2 and 5 of United States Patent No. 3,736,968 entitled "Method and Apparatus for Processing Logs" (Mason '968); claim 3 of United States Patent No. 3,746,065 entitled "Process and Apparatus for Veneer Cutting" (Mason '065); and claims 4 and 8–13 of United States Patent No. 3,852,579 entitled "Method and Apparatus for Determining the Surface Configuration of Elongate Objects, Particularly Logs" (Sohn '579). Sohn '579 is a joint invention of Sohn of Sun Studs and Hunter and Holmes of Applied Theory; Hunter and Holmes assigned their interests to Sun Studs, in accordance with the consulting contracts. Collateral information concerning these patents appears in *Sun Studs,* 772 F.2d at 1563–64, 227 USPQ at 85–86.

Following four weeks of trial the jury[2], in a series of special verdicts, upheld the

2. Sun Studs described the jury as follows: "Among the jurors were two electronics technicians and a radiographer. Both of the electronics technicians had training and experience with digital computers. One had twenty years' experience as a technician for Tektronix, Inc. and had also worked three years in a sawmill. One juror was a librarian for a local college. Another was the administrative assistant for the executive director of a county transportation depart-

validity of all the claims. The district court denied Applied Theory's motions for judgment n.o.v. and for a new trial.

The standard of appellate review, on denial or grant of judgment n.o.v., is whether a reasonable jury could have reached the verdict that was reached by this jury. *See Neely v. Eby Constr. Co.*, 386 U.S. 317, 322, 326–29, 87 S.Ct. 1072, 1076–77, 1078–80, 18 L.Ed.2d 75 (1967) (discussing procedures and powers on appellate review of jury verdict); *Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). *See also, e.g., Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512, 220 USPQ 929, 935 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984) (whether motion denied or granted, review follows the path trod by the district court); 5A Moore's Federal Practice ¶ 50.07[2] (1988). We determine whether there was substantial evidence in support of the jury's verdicts of validity, on the entirety of the evidence adduced and in light of the instructions to the jury on the applicable law. *See, e.g., Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1571, 1 USPQ2d 1081, 1084–85 (Fed. Cir.1986) (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546, 220 USPQ 193, 197 (Fed.Cir.1983), and citing *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1454–55, 223 USPQ 1161, 1166–67 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985)) (" 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review"); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 618–19, 225 USPQ 634, 636 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *Weinar v. Rollform, Inc.*, 744 F.2d 797, 805, 223 USPQ 369, 373 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985); *Per-*

*kin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894–95, 221 USPQ 669, 674 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

The jury instructions are reviewed for legal correctness, with due consideration to any objections raised at trial. Faulty instruction of law, if harmful in effect, is grounds for a new trial. *Shatterproof Glass Corp.*, 758 F.2d at 626, 225 USPQ at 643 (denial of new trial reviewed on abuse of discretion standard).

### *35 U.S.C. §§ 102(e) and 102(g)*

Applied Theory argues that the jury was not instructed that it must consider Mouat Patent No. 3,945,125 ("Mouat") as a prior art reference against the patents at issue and that the jury verdict is thereby fatally flawed, wherefore the issue of validity must be retried. Applied Theory also argues that the district court erred in its analysis of Mouat when the court sustained the jury verdict upon treating Mouat as a reference.

The Mouat patent issued after the filing and issue dates of all three of the patents in suit, but was the first to be filed. The pertinent dates are:

Mouat 3,945,125 filed Apr. 27, 1970, issued Mar. 23, 1976

Mason 3,736,968 filed Nov. 25, 1970, issued June 5, 1973

Mason 3,746,065 filed Aug. 5, 1971, issued July 17, 1973

Sohn 3,852,579 filed Mar. 23, 1973, issued Dec. 3, 1974

Applied Theory's position is that Mouat is effective as a reference as of Mouat's conception date, applying 35 U.S.C. § 102(g). Sun Studs' position is that Mouat is a reference only under 35 U.S.C. § 102(e), and is effective only as of its filing date, thereby falling into the category of "secret prior art"[3]. Sun Studs also states that the Mou-

---

ment. One had worked twenty years for a telephone company. Two actually used computers in their work. One woman had a husband and a son in the lumber business and another son who is a professor of civil engineering. One juror had a masters degree, and another a two-year technical degree, and one had various

training in electronics. All had at least a high school education."

**3.** "Secret prior art" is so called because although it is effective as a reference as of its filing date, *see generally Hazeltine Research v. Brenner*, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304, 147 USPQ

at and Mason inventions are not the same and the claims are not the same, that § 102(g) is therefore inapplicable, and if § 102(g) were applicable that the Mouat patent has not been shown to be entitled to the benefit of any date earlier than its filing date.

■ When patents are not in interference, the effective date of a reference United States patent as prior art is its filing date in the United States, as stated in § 102(e), not the date of conception or actual reduction to practice of the invention claimed or the subject matter disclosed in the reference patent. Sun Studs told the district court, and its expert witness testified, that Mouat can be removed as a reference against the inventions claimed in Mason '968 and '065 on a showing that these inventions predate the Mouat filing date, a procedure regulated by 37 C.F.R. § 1.131 during prosecution before the Patent and Trademark Office.[4] Sun Studs presented evidence to the jury for the purpose of showing conception in 1969 of the Mason inventions, and diligence to their constructive reduction to practice.

Applied Theory offered evidence, through the testimony of Mouat, that the Mouat invention was conceived in 1966. Applied Theory argues that the Mouat patent was thus established as a reference as of 1966, for its entire disclosure, and that the district court seriously erred in allowing the jury to decide the effect of Mouat's patent as a reference based on the jury's view of Mouat's evidence. Sun Studs in turn argues that proof of conception alone is insufficient to establish "invention" under § 102(g); and also that if Mouat is deemed to be a reference under § 102(g),

this status as prior art applies only to the Mouat claims. Sun Studs also argues that the Mouat disclosure is not enabling, referring to the patent examiner's rejection during prosecution of the Mouat patent application on the ground of insufficient disclosure of optical scanning; and that a Mouat embodiment is inoperative, and that inoperative features can not be prior art under § 102(g). Sun Studs also argues, inconsistently, that Mouat can not be a reference because it is "secret prior art", referring to *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1444–46, 223 USPQ 603, 606–07 (Fed.Cir.1984), wherein this court reaffirmed the public policy against the use of secret prior art except as provided in § 102(e).

Both sides appear to have confused interference practice under § 102(g) with prior art status under § 102(e). *See Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376, 231 USPQ 81, 87 (Fed.Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987) (discussing determination of priority of invention under § 102(g), and noting that "§ 102(g) prior art can be used for § 103", *id.* at 1371 n. 1, 231 USPQ 84 n. 1). The Mouat reference, as the district court held, does not describe or claim the identical invention to Mason. It is not prior art under § 102(g), but under § 102(e). The several errors in law by both sides are in this case harmless to Applied Theory, however, for the district court, receiving conflicting advice as to the correct law, erred on the side of treating Mouat as a reference against all of the patents in suit, and allowing the jury to do the same.

■ Under 35 U.S.C. § 102(e) the entire disclosure of Mouat's specification is effec-

---

429 (1965), *Alexander Milburn Co. v. Davis–Bournonville Co.,* 270 U.S. 390, 401, 46 S.Ct. 324, 325, 70 L.Ed. 651 (1926), its existence does not become known until the issuance of the United States patent.

4. 37 C.F.R. § 1.131 (1988) **Affidavit or declaration of prior invention to overcome cited patent or publication.**

(a) When any claim of an application or a patent under reexamination is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, ... and the inventor ...

shall make oath or declaration as to facts showing a completion of the invention in this country before the filing date of the application on which the domestic patent issued,....

(b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from said date to a subsequent reduction to practice or to the filing of the application....

tive as a reference, but only as of Mouat's filing date. Sun Studs had adduced evidence to show conception of the Mason inventions before Mouat's filing date. The district court correctly allowed the jury to consider this evidence, although the court erroneously instructed the jury that corroboration was required and adopted other criteria derived from interference practice. These errors placed a greater burden on Sun Studs than the law requires, and thus favored Applied Theory.

The district court stated in its subsequent analysis, on deciding Applied Theory's post-trial motions, that "whether an art reference is prior to a patented invention is determined by the dates of reduction to practice," thus denying Sun Studs the benefit of its evidence of Mason's earlier conception as against Mouat's date of constructive reduction to practice. This error also favored Applied Theory, because on this criterion Mouat was held by the court to be a reference against the two Mason patents.

The court allowed the jury to consider as prior art the materials that Mouat had produced as evidence of conception; an error that favored Applied Theory. The court also stated that Mouat's conception occurred in 1966, without discussing other questions raised by Sun Studs, such as enablement and diligence, that would be pertinent in establishing Mouat's entitlement to a date of invention under § 102(g); an error again favoring Applied Theory.

In its subsequent analysis, the district court applied Mouat as a reference for all it disclosed, both alone and in combination with the other references cited by Applied Theory. The court found, for example, that Mouat did not teach the positioning, scanning, and plotting steps of Mason '968, and that this gap was not plugged by other prior art references. Although Applied Theory urges us to redecide the question of validity and reargues all the prior art, our appellate role, like that of the district court on Applied Theory's motion for judgment n.o.v., is to determine whether a reasonable jury could have reached the verdict that was here reached, on the law and facts before it. *Lavender,* 327 U.S. at 653, 66 S.Ct. at 744; *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 607, 222 USPQ 654, 657 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984); *Perkin–Elmer Corp.,* 732 F.2d at 894–95, 221 USPQ at 674; *White v. Jeffrey Mining Mach. Co.,* 723 F.2d 1553, 1558, 220 USPQ 703, 705 (Fed. Cir.1983), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984).

Although there were errors in the jury instructions concerning the treatment of Mouat as a reference, they do not support Applied Theory's request for a new trial, for despite these errors the jury held that the patents had not been proved invalid. *See Devices for Medicine, Inc. v. Boehl,* 822 F.2d 1062, 1066 (Fed.Cir.1987) ("trials must be fair, not perfect").

We have considered all of Applied Theory's arguments with respect to the three patents in suit, and conclude that a reasonable jury could have upheld the validity of each of these patents. The judgment of validity is affirmed.

## II

### *Infringement*

The accused installations were classified by stipulation into six classes of saw or veneer mills, each class represented by a specified mill. By special verdicts the jury found infringement of some patent claims by some mills, and noninfringement by others. These findings are summarized as follows:

Claims 1 and 5 of the Mason '968 patent are infringed by class b sawmills, class e and f veneer mills, and class a sawmills when the "cant centering routine" is used; class c and d sawmills do not infringe these claims.

Claim 2 of Mason '968 is infringed by class b, c, and d sawmills.

Claim 3 of Mason '065 is infringed by class e and f veneer mills.

Claims 8 and 9 of Sohn '579 are infringed by class e and f veneer mills.

Claim 4 of Sohn '579 is infringed by class f veneer mills.

Claims 1–3 and 10–13 of Sohn '579 are not infringed by class f veneer mills.

The district court granted Applied Theory's motion for judgment n.o.v. as to all the jury verdicts of infringement. Sun Studs argues that the requirements for judgment n.o.v. were not met, pointing out that judgment n.o.v. can be granted

> only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment;

and in doing so the court

> must view the evidence in the light and with all reasonable inferences most favorable to the party who secured the jury verdict.

5A *Moore's Federal Practice* ¶ 50.07[2] at 50–64, 50–70 (1988). It is immaterial that the court might believe that another conclusion is more reasonable:

> Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944). If the jury verdict is reasonable it must be upheld. *Id.* (it is not the court's duty to search for conflicting evidence).

### Claims 1 and 5 of Mason '968

Class b sawmills were defined as nonconventional carriage sawmills whose principal product is two-by-four studs, and were deemed represented (by stipulation) by the Simonson Lumber Sawmill in Smith River, California. Class a sawmills were defined as conventional carriage sawmills with "independent knees", of which C & D Lumber Sawmill was deemed representative.[5]

The claims are multi-step method claims, illustrated by Mason '968 claim 1:

1. A method of processing a log to obtain the optimum amount of wood products of a selected grade therefrom, comprising the steps of

positioning the log with respect to a reference location,

scanning the log to determine certain of its dimensions with respect to the reference location,

plotting in a data processing equipment at least one planar profile of the dimensions of the log, said profile being taken in a plane passing through the ends of the log,

computing in a data processing equipment at least the center axis of the widest parallelogram that can be superimposed within the plotted profile of the log, and

repositioning the log with the center axis parallel to an index line of a log processing equipment.

The district court, granting Applied Theory's motion for judgment n.o.v., held that the "parallelogram" required in the fourth step of the claim removed the process of the class b mills from infringement, both literally and by the doctrine of equivalents.

It was generally undisputed that the formula for computing the center axis in the fourth step is based on a trapezoid, not a parallelogram. The trapezoidal shape accommodates log taper, which may extend to two inches of taper per sixteen feet of log length. The parties disputed before the jury the significance of this difference, Sun Studs stating that it is a minor change in the computer program, and Applied Theory stating otherwise. The jury found infringement, but the district court in explaining its grant of judgment n.o.v. found that the accused systems perform the computation in a "substantially different way". The district court stated: "The parallelogram is a subset of the trapezoid and while every parallelogram is a trapezoid, not all trapezoids are parallelograms".

Sun Studs argues that the accused systems necessarily compute for a parallelogram when the taper rate is zero, and that

---

**5.** Applied Theory states in its brief that these mills are not fully representative, appearing to contradict the stipulation. This dispute, relating to taper rates and the center cant routine, was noted in the district court's instructions to the jury, and partly resolved in special verdicts. This point does not merit a new trial.

this occurs ninety percent of the time. Sun Studs also argues that the district court in overturning the jury verdict placed undue emphasis on the details of the computation (fourth) step; stating that all the other claim steps were literally infringed, that the fourth step was infringed by an equivalent computation, and that infringement is clear when the claims and the accused systems are viewed in their entirety. (Although Applied Theory also argues that class b sawmills do not position the log prior to scanning, as discussed *infra* a reasonable jury could have found that this step was performed.)

Similarly, the court granted judgment n.o.v. that class b sawmills do not infringe claim 5 of Mason '968, on the basis that the accused processes compute the center axis of a truncated cone, in order to accommodate any log taper that may be present, rather than the center axis of a cylinder as stated in claim 5. On generally similar reasoning the court granted judgment n.o.v. as to class a sawmills using the cant centering routine.

Sun Studs does not press the issue of literal infringement, and we confine our review to the doctrine of equivalents.

*A. The Doctrine of Equivalents.*

■ Equivalency is determined in light of the prior art, the patent specification, and the prosecution history, as the accused systems are tested by the standards set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950). Sun Studs' witnesses testified that the accused processes perform every step of the multi-step claimed processes and that, as to the fourth step of claims 1 and 5, Mason '968 contemplates that log profile shapes other than the parallelogram and the cylinder may be used. Sun Studs cites the statement in the Mason specification that the method "comput[es] the center axis of the largest surface of preselected form (such as a rectangle or a cylinder) that can be superimposed within the measured dimensions of the log." Mason used similar words during prosecution of the

application before the patent examiner, and Sun Studs suggests that Mason's discussion in an amendment of "the coordinates of the largest surface of preselected form (*e.g.,* a parallelogram) that can be superimposed" shows that the parallelogram was viewed by the inventor as merely illustrative.

■ Equivalency and infringement are questions of fact. *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 847, 221 USPQ 657, 662 (Fed.Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984). The facts and their significance were discussed by witnesses and argued by counsel at trial. Sun Studs emphasizes the testimony that class b sawmills are stud mills that use eight-foot log blocks, and that ninety percent of the time the taper rate is at or about zero, such that a parallelogram is the shape most commonly used in the computation. Applied Theory emphasizes that the computation program is different if based on a trapezoid rather than a parallelogram, and argues that it is therefore immaterial if the analysis is actually of a parallelogram.

We conclude that a reasonable jury could have found that the accused and claimed systems perform substantially the same functions in substantially the same way to obtain substantially the same result, *Graver Tank, supra,* whether step 4 is based on a parallelogram or trapezoid, or a cylinder or truncated cone.

*B. Prosecution History Estoppel.*

Applied Theory argues that prosecution history estoppel negates the possibility of finding infringement under the doctrine of equivalents. The district court relied on estoppel in its grant of judgment n.o.v.

■ "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance". *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452, 227 USPQ 293, 296 (Fed.Cir.1985). *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d

1576, 1580, 6 USPQ2d 1557, 1561 (Fed.Cir. 1988) (consulting prosecution history to interpret claims). In determining whether estoppel lies because of a change in the claims during prosecution, it is necessary to consider what was changed, and why. *Bayer Aktiengesellschaft v. Duphar Int'l Research*, 738 F.2d 1237, 1243, 222 USPQ 649, 653 (Fed.Cir.1984). The scope of estoppel must be determined in light of the prior art that occasioned the change, as well as representations made to the patent examiner as to the reason for the change. *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.*, 793 F.2d 1279, 1284, 230 USPQ 45, 48 (Fed.Cir.1986).

In the application that led to Mason '968, claim 1 as filed used the words "a preselected shape", while the words "parallelogram" and "cylinder" appeared in other claims. Original claim 1 also differed from original claim 2 (now issued claim 1), and from all the other method claims, in the absence from original claim 1 of the entire step of "plotting ... at least one planar profile". All the claims were initially rejected for obviousness (35 U.S.C. § 103), the examiner citing references to Ottosson and Graham and stating that these references show the claimed method "except for # 2 step and means for aligning the log on the carriage ...". There was no rejection based on the description of the geometric shape.

Sun Studs' argument for patentability of original claim 2 was that the final claim clause, "repositioning the log with the center axis parallel to an index line ...", provided patentable distinction from Ottosson and Graham. This clause, however, also appears verbatim in original claim 1. Thus the discussion of patentability before the PTO appears unrelated to the description of the geometric shape, and the cancellation of original claim 1 and the allowance of claim 2 produce no estoppel with respect to the geometric shape, the sole issue of equivalency.

■ The facts pertinent to prosecution history estoppel were thoroughly aired before the jury, discussed by witnesses, and argued by counsel. The district court held

that because the "broad and vague" claim 1 was cancelled, Mason "cannot now recapture what was abandoned". However, estoppel is not automatic whenever a claim is cancelled, *Mannesmann Demag, supra*, but must be determined on the facts of the case. The court's ruling, based on an apparent misperception of law, can not overturn the jury verdict of infringement, for there was substantial evidence whereby a reasonable jury could have found no estoppel arising from the prosecution history.

### C. The "Pioneer" Issue.

The district court also supported its grant of judgment n.o.v. on the basis that while the Mason '968 invention was "important", it was not a "pioneer" and therefore was not entitled to a "broad range" of equivalents. The district court then denied this invention all equivalency with respect to the geometric shape.

The concept of the "pioneer" arises from an ancient jurisprudence, reflecting judicial appreciation that a broad breakthrough invention merits a broader scope of equivalents than does a narrow improvement in a crowded technology. But the "pioneer" is not a separate class of invention, carrying a unique body of law. The wide range of technological advance between pioneering breakthrough and modest improvement accommodates gradations in scope of equivalency. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 846 F.2d 1369, 1370, 6 USPQ2d 1886, 1887–88 (Fed.Cir. 1988) (denying rehearing). The place of a particular invention in this spectrum depends on all the circumstances, *Royer v. Schultz Belting Co.*, 135 U.S. 319, 325, 10 S.Ct. 833, 835, 34 L.Ed. 214 (1890), and is decided as a factual matter, *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1124, 227 USPQ 577, 587 (Fed. Cir.1985).

■ Each case in which infringement by equivalents is asserted turns on its facts, as *Graver Tank* emphasized, and requires the trier of fact to balance the competing public policies of avoiding "a fraud on the patent", 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330, and the need for reasonable

certainty by the public as to the scope of the patent grant. *Id.* at 607, 70 S.Ct. at 855–856, 85 USPQ at 330; *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1572, 231 USPQ 833, 842 (Fed.Cir.1986).

Whether or not the Mason '968 invention merits the encomium of "pioneer", the jury's presumed findings of equivalence as to the accused systems' usage of the trapezoid or truncated cone shapes in the computation steps of claims 1 and 5 must be upheld, for there was substantial evidence supporting the jury verdicts.

## D. The Jury Verdicts of Infringement.

■ On review of a jury's finding of infringement, the court must consider the evidence in the light most favorable to the party in whose favor the jury found, and must not substitute its choice for the jury's in drawing inferences or deciding between conflicting evidence. *Tennant*, 321 U.S. at 34–35, 64 S.Ct. at 412; *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 425, 231 USPQ 276, 278 (Fed.Cir.1986). Although the district court presented a detailed analysis of the facts, it is not controlling that the trial court reached a different conclusion, if the jury's verdict is sustainable on the evidence and the law. *Bailey v. Central Vermont Ry.*, 319 U.S. 350, 353, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943) (when fair-minded persons might reach different conclusions, the question is left to the jury).

■ We conclude that a reasonable jury could have found infringement by class b sawmills, and by class a mills using the cant centering routine. The district court's grant of judgment n.o.v. is reversed. On remand judgment shall be entered on the jury verdicts.

### Mason '968 and '065: class e and f veneer mills

■ The jury found that class e and f veneer mills infringe claims 1 and 5 of Mason '968 and claim 3 of Mason '065. The dispute as to class e mills was concentrated on the plotting and computing steps, Sun Studs again arguing that the computing step is equivalent, in the accused sys-

tems, to that of the claims. The parties reargue all the issues as to both class e and class f mills, and recharacterize the evidence in conflicting ways. However, there was substantial evidence to support the jury's verdicts as to these mills and claims. For reasons similar to those discussed *ante*, the district court's grant of judgment n.o.v. is reversed, and judgment is ordered on the jury verdict.

### Claim 2 of Mason '968: class b, c, and d sawmills

The jury found that the non-conventional carriage sawmills of class b, represented by Simonson Lumber, and classes c and d, represented by the Bohemia Sawmill before and after conversion, infringe claim 2 of Mason '968. Claim 2 is an apparatus claim, as follows:

2. Log processing equipment comprising

a saw array aligned with an index line,

aligning means for receiving and holding a log at a reference location,

photoelectric scanning means spaced from said reference location for producing an output signal representative of the dimensions of a log passed by said scanning means,

data processing means connected to said scanning means for evaluating said output signal and producing a data output signal in response thereto,

charger means for releasably gripping said log at said reference location and transporting the log past said scanning means, said charger means including means responsive to said data output signal for angularly repositioning said log with respect to said index line,

a saw carriage, aligned with said index line and moving with respect to said saw array, for receiving from said charger means said log when repositioned, and

control means associated with said saw carriage for selectively moving said carriage with respect to said saw array, said control means being responsive to said data output signal whereby said log carried by said saw carriage is divided into

cants by the saw array in accordance with a preselected cutting pattern stored in said data processing means.

Sun Studs' witnesses testified that the aligning means in the accused mills is combined with the charger means, while Applied Theory's position was that the alignment function is not performed at all. The jury decided the disputed factual questions of what functions are performed, and by what means, in favor of infringement.

Granting Applied Theory's motion for judgment n.o.v., the district court held that claim 2 requires, as a matter of law, that there be a separate aligning means. Stating that "there simply is no separate alignment means in class b sawmills", the court held that there is no infringement, either literally or under the doctrine of equivalents.

■■■■ It was legal error to hold that the aligning and charging steps must be performed by separate elements in the apparatus. One-to-one correspondence of components is not required, and elements or steps may be combined without *ipso facto* loss of equivalency. Each case must be decided in light of the nature and extent of the differences between the accused device and the claimed invention, on the equitable principles of the doctrine of equivalents. *See Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856–857, 85 USPQ at 330; *Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935 (1878) (determining whether the accused devices perform different functions in a different way and produce a substantially different result); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985) (equivalency determined of the entirety of the accused device); *Perkin–Elmer Corp.*, 732 F.2d at 900, 221 USPQ at 678 (considering entire invention in determining equivalency).

■■■■ An apparatus claim describing a combination of components does not require that the function of each be performed by a separate structure in the apparatus. The claimed and accused devices must be viewed and evaluated as a whole. *Hughes Aircraft Co. v. United States*, 717

F.2d 1351, 1364, 219 USPQ 473, 483 (Fed. Cir.1983); *Magrath v. Draper Corp.*, 384 F.2d 672, 673, 155 USPQ 609, 610 (1st Cir. 1967) (infringement is not avoided by making into one part that which has been shown as two).

■■■■ The district court may have been led into error by applying to the doctrine of equivalents the more limited scope of the literal infringement provisions of 35 U.S.C. § 112 ¶ 6, for the court held in granting judgment n.o.v. that the absence from the accused apparatus of a discrete aligning structure corresponding to the V-shaped supports described in the '968 specification meant that there could be no infringement under the doctrine of equivalents. Under § 112 ¶ 6 "the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function." *D.M.I. v. Deere*, 755 F.2d at 1575, 225 USPQ at 239. Under the doctrine of equivalents, however, each step is viewed in the context of the entire claim, *Hughes Aircraft*, 717 F.2d at 1364, 219 USPQ at 482, from the perspective of the facts of the claimed invention and the accused system. *See generally Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987) (in banc), *cert. denied, —— U.S. ——*, 108 S.Ct. 1226, 1474, 99 L.Ed.2d 426, 703 (1988) (holding that the omission of a claimed function and its substantial equivalent avoided infringement).

■■■■ Review shows that a reasonable jury could have found that substantially the same functions were performed in substantially the same way with substantially the same result. The district court's grant of judgment n.o.v. is reversed, and on remand judgment shall be entered on the jury verdicts of infringement of claim 2 of Mason '968 by class b, c, and d sawmills.

### Claims 4, 8 and 9 of Sohn '579

■■■■ Claims 8 and 9 describe methods for processing a log whereby the yield of

usable veneer is maximized. Claim 4 is directed to the apparatus that performs these functions. Claim 8 is illustrative:

8. A method for determining the optimum spin axis for a log when rotated in a veneer lathe in order to maximize the yield of usable veneer therefrom comprising the steps of:

a. gripping said log by its ends and rotating it about a longitudinal axis thereof;

b. scanning preselected portions of the surface of said log while it is being continuously rotated to determine the approximate configuration thereof;

c. determining the center axis of the largest right cylinder which can be included within the volume of said approximated log configuration; and

d. delivering said log into the chunks of said veneer lathe positioned in a manner so that it will be rotated about said right cylinder axis.

The jury by special verdicts found that claims 8 and 9 were infringed by class e veneer mills, represented by the Brooks–Scanlon mill before conversion, and that claims 4, 8 and 9 were infringed by class f veneer mills, represented by the Willamette Industries mill in Springfield, Oregon.

Again the district court disagreed with the jury. The focus of the district court's grant of judgment n.o.v. was that in the accused systems the approximate configuration of the log is determined by a different computation from that taught in Sohn '579. The district court interpreted claim clause c to mean that the claims are limited to the largest right cylinder that can be inscribed within the log body. Sun Studs argued at trial that the "approximated log configuration" in clause c is not so limited.

In the accused systems the cylinder may extend outside the log body due to surface irregularities. Sun Studs' position at trial was that Applied Theory merely made minor adjustments of the computer program; that the accused systems use the right cylinder of step c; and that the log configuration to which the cylinder is fitted is the same or equivalent in the claimed and the accused systems. A reasonable jury could have so found.

The district court stated that prosecution history estoppel bars a finding of equivalency. All of the Sohn '579 claims had been rejected under 35 U.S.C. § 112, on the examiner's position that there was an inadequate disclosure of how the computer performs its functions. This rejection was withdrawn after Sohn argued that the computation was routine to one skilled in the art, and that it was necessary only to follow the specification. We do not discern a basis for estoppel in these events.

The court also found that Sohn '579 must be limited to the embodiment described in the specification, holding that since Applied Theory's polygon method of computation was not discussed in Sohn's specification, the methods could not be equivalent. Differences were also asserted in that the spin axis in the Applied Theory computation was often greater than 0.1 inch different from that of the Sohn method, and in the determination of log configuration by points on the surface as compared to tangents to the log that touch the surface. Applied Theory also states that the accused systems achieve a different result in that they maximize the recovery of total usable veneer instead of continuous full-width veneer. Sun Studs points out that claims 8 and 9 do not draw this distinction, and argues that the distinction is not of technological significance.

All these disputed factual issues were debated by witnesses and counsel at trial. They are reargued on appeal. On conflicting testimony as to differences in the systems and their significance, there was substantial evidence that the claimed inventions were practiced in the accused systems. We conclude that a reasonable jury could have found that the accused systems in classes e and f veneer mills infringe the claims, as this jury found. The district court erred in substituting its judgment for that of the jury. The district court's grant of judgment n.o.v. is reversed, and on remand judgment on the jury verdicts shall be entered.

### E. The Jury Verdicts of Non-infringement.

The jury found non-infringement of claims 1 and 5 of Mason '968 by class c and d sawmills, and by class a sawmills when using the manual or automatic routine but not when using the cant centering routine. Class f veneer mills were found not to infringe claims 1–3 and 10–13 of Sohn '579.

The differences from the claimed invention for these systems, and the significance of these differences, were the subject of conflicting testimony before the jury. For example, the distance-measuring scanner described in the Sohn '579 specification measures phase shift, while the Applied Theory scanner measures image displacement; a reasonable jury could have found that the scanning function is not performed in substantially the same way, thus negating literal infringement under § 112 ¶ 6.

Sun Studs argues that the district court's instructions led the jury away from correct application of the doctrine of equivalents as established by *Graver Tank*, and limited the jury to determination of literal infringement under § 112 ¶ 6. The court instructed the jury in the words of *Graver Tank*, adding the qualification that all the claimed steps or functions must be performed in the accused systems, but that steps or functions may be combined. These instructions were directed to the specific issues raised by the accused systems. In light of the evidence, Sun Studs has not met its burden of showing that reasonable jurors could not have reached the verdicts of non-infringement that were reached by this jury. We have not been persuaded that the jury was misled, and conclude that the district court did not abuse its discretion in denying Sun Studs' motion for a new trial on those systems for which the jury found non-infringement.

The judgment on these special verdicts is affirmed.

## III

### Contract and Related Issues

The jury rendered special verdicts that Applied Theory breached its 1971 contract with Sun Studs by use of the SIMPX computer program that was developed for Sun Studs, that Applied Theory breached its common law confidential relationship with Sun Studs by misappropriation of the SIMPX program, and that Applied Theory infringed Sun Studs' common law copyright in this program. Applied Theory has not appealed from the judgment on these verdicts.

Sun Studs appeals the judgment entered on the jury verdict that Sun Studs breached its contractual obligation to share royalties with Applied Theory, arguing that such breach was excused, as a matter of law, by Applied Theory's prior breaches. Sun Studs refers, *inter alia,* to the contract provision that required Applied Theory to assist in protecting, defending and enforcing any patent resulting from its work for Sun Studs. The district court stated that this provision, viewed as an agreement not to contest patent validity, is void and unenforceable in view of *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), and thus that any breach of this provision by Applied Theory could not prejudice its right to receive future royalty share under the contract. Sun Studs argues that it never asserted that Applied Theory was estopped from challenging patent validity, but that when Applied Theory did so it breached its contractual commitment to assist in protecting, defending, and enforcing the patent.

In *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224–25, 6 USPQ2d 2028, 2031 (Fed.Cir.1988), we discussed the public policy considerations of *Lear* as they may apply to assignors. We concluded that the right of an assignor to challenge the validity of the assigned patent must be decided by balancing the equities in the particular case, pointing out that the assignor-assignee relationship differs from that of licensee-licensor, as do the public policies applicable to these relationships.

The facts herein differ from those of *Diamond Scientific*. The Applied Theory inventors were not employees of Sun Studs; they were a firm of consultants,

hired for the purpose of doing the specific work that produced the assigned invention. The assignment was an express condition of the consulting contract, as was Applied Theory's agreement to preserve in confidence the information developed, and its agreement to aid in protecting, defending, and enforcing any resulting patents. The issue raised in this case, unlike that in *Diamond Scientific*, is not Applied Theory's right to challenge validity, but its right to share future royalties under the terms of the contract.

We determine whether Applied Theory's undertaking to protect and defend the assigned patent violates public policy, such that Sun Studs is required to perform its contract obligations despite this breach, or any other breach, by Applied Theory. We must weigh the public policy enunciated in *Lear*, favoring the elimination of invalid patents, against the policies of upholding the integrity of contracts and fostering commercial relationships leading to the development of inventions.

We do not deem Applied Theory's promise to protect, preserve and defend any patents resulting from the consulting contract to be against public policy. The development of technology and invention was the core purpose of the contract, and the preservation of such invention was a legitimate concern of the contracting parties. *Lear* does not require a contrary holding, as we discussed in *Diamond Scientific*.

The district court also suggested that the jury could have believed that the undertaking by Applied Theory to protect, preserve, and defend any patents applied only to suits by third parties. The jury, however, expressly found that Applied Theory breached its contract by misappropriation of the SIMPX program as well as breaching its common law confidential relationship, breaches in themselves material.

Thus the effect of Applied Theory's breach of its contractual obligations is considered under the principles of contract law. Oregon law is that:

In every contract there is an implied covenant that neither party shall do any-

thing that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists a covenant of good faith and fair dealing.

*Perkins v. Standard Oil Co.*, 235 Or. 7, 16–17, 383 P.2d 107, 112 (1963) (quoting 3 Corbin on Contracts 278). It is no longer disputed that Applied Theory breached certain contract obligations. The breaches began in 1973 or 1974, and indeed Applied Theory argued, successfully, that its breach of the common law obligation of confidentiality occurred so early that recovery therefor was barred by the Oregon statute of limitations.

Obligations of continuing performance by one party to a contract, after breach by the other party, are treated in the *Restatement (Second) of Contracts* (1981) as follows:

§ 237   Effect on Other Party's Duties of a Failure to Render Performance

Except as stated in § 240 [Part Performance], it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due him at an earlier time.

Applied Theory used the term "boilerplate" to describe the provisions it breached, arguing that they are not material. However, implementing the *Restatement*, Oregon courts have determined whether the breach was material and whether nonperformance by the other party was thereby justified. *See, e.g., Trachsel v. Barney*, 264 Or. 29, 503 P.2d 696, 698 (1972); *Kotan v. School District No. 110C*, 13 Or.App. 139, 509 P.2d 452, 456–57 (1973). *See generally Restatement (Second) of Contracts* (1981), §§ 237, 241.

In light of the jury's express findings of breach of contract and breach of confidence by Applied Theory, as well as the failure to protect, defend, and enforce the patent, we conclude that Sun Studs was not obligated to perform the residual obligations incurred after breach by Applied

Theory. *Wasserburger v. American Scientific Chem., Inc.*, 267 Or. 77, 80, 514 P.2d 1097, 1099 (1973) (finding that a party's actions were material breach of continuing contract obligations, thus discharging the duty of the other party to perform); *Restatement (Second) of Contracts* (1981) § 237. The jury, having found breach by both sides, was not asked about discharge. The court erred in holding that performance by Sun Studs was required after, and despite, the breach by Applied Theory. *Wasserburger*, 267 Or. 77, 514 P.2d at 1099–1100. The judgment requiring Sun Studs to share its royalties with Applied Theory is reversed.

In view of our decision, we do not review the judgment with respect to the offset of Coe's contributions to the costs of litigation.

## IV

### *Laches*

Applied Theory asserted at trial that Sun Studs waited too long before filing suit. The questions of laches and estoppel were submitted to the jury, who found that laches applied against Sun Studs on sawmill infringement but not on veneer mill infringement. The jury found that there was no estoppel.

The jury was instructed that Applied Theory must prove, by a preponderance of the evidence, that Sun Studs unreasonably and inexcusably delayed in bringing suit, and that this delay was materially prejudicial to Applied Theory. The court told the jury: "Prejudice arises where on account of delay, the alleged infringer made a substantial investment in building up its business or where the accused infringer would have avoided the alleged infringing conduct by modifying its business." We discern no error in these instructions. *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1572, 4 USPQ2d 1939, 1940 (Fed.Cir.1987); *Mainland Industries, Inc. v. Standal's Patents Ltd.*, 799 F.2d 746, 748–49, 230 USPQ 772, 774 (Fed.Cir.1986) (mentioning activities such as additional investment, increased advertising expenses, and improvements made to equipment, as possible evidence of prejudicial reliance on delay in filing suit).

There was testimony that Sun Studs suspected by 1974 that Applied Theory was engaged in culpable conduct. However, a finding of laches can not be based on mere delay in bringing suit. *Hottel Corp., supra.* Applied Theory does not assert that it would have refrained from its infringing activities, or that it was otherwise prejudiced by the delay. There is no presumption of prejudice in this case, *id.*, and the burden of proving prejudice was on Applied Theory because less time had elapsed than the six year period for which damages are recoverable under 35 U.S.C. § 286. *See generally Bott v. Four Star Corp.*, 807 F.2d 1567, 1575, 1 USPQ2d 1210, 1216 (Fed. Cir.1986) (shifting the burden of going forward). Applied Theory refers to no evidence of prejudice whatsoever.

The jury verdict of laches as to sawmills can not stand, for there was not substantial evidence on which this verdict could have been reached. The judgment entered thereon is reversed.

## V

### *Damages*

Sun Studs asserts that the instructions on damages were erroneous in law, and that a new trial is required on this issue.

Sun Studs had agreed that damages should be measured by a royalty. Following extensive discussion with counsel, the district court instructed the jury that damages were to be "not less than a reasonable royalty", which the court defined as an "established royalty", to be found as follows:

> Turning to the definition of an established royalty, it is a royalty which, one, was agreed to prior to the infringement; two, was paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who use the invention or was paid by an exclusive licensee who had such a significant amount of sales volume as to indicate a general acquiescence in its reasonableness by those who use the invention; three, was not negotiated under threat of a lawsuit or in settlement of a lawsuit; and four, paid for comparable rights of activity under the patent.

This instruction, although unobjectionable in the abstract, suffers from the flaw that it does not well fit this case. There was no agreed royalty prior to the start of infringement (the instruction's first requirement). There was no general acquiescence by a number of persons (the first part of the instruction's second requirement). There was an exclusive licensee (the second part of the second requirement), but that license was negotiated during the infringe-

ment by Applied Theory (thus compromising the third and fourth requirements). This instruction can not have been helpful to the jury. *See Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 723, 223 USPQ 1264, 1276 (Fed. Cir.1984) (instructions should be directly applicable by the jury to the issues before it).

■ Although Sun Studs presses the weaknesses in this instruction, the district court also explained to the jury the factors outlined in *Georgia–Pacific Corp. v. United States Plywood Co.*, 318 F.Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), which state the practical considerations in royalty negotiation between a hypothetical willing licensor and licensee. We have recognized that compensation for infringement can take cognizance of the actual commercial consequences of the infringement, and that the hypothetical negotiators need not act as if there had been no infringement, no litigation, and no erosion of market position or patent value, *Bio–Rad Laboratories, Inc.*, 739 F.2d at 617, 222 USPQ at 664; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158, 197 USPQ 726, 731 (6th Cir.1978). However, these points are not pressed on appeal. The chief dispute before us as to the law governing the hypothetical negotiation appears to be the date as to which such negotiation should be deemed to have occurred—that is, whether the date should be measured by contributory or actual infringement, and when such events occurred. The line being drawn is too fine. Sun Studs has not shown that the jury verdict could have been significantly changed by any reasonable variation in the postulated date of the hypothetical negotiation.

Sun Studs argues that damages should be measured by the value of these systems to the sawmill and veneer mills, that is, to the ultimate user. Sun Studs states that the value of a license to the user mills far exceeds the value to a provider of systems, such as Applied Theory or Coe Manufacturing (Sun Studs' exclusive licensee). Sun Studs argued this position before the jury, and complains that the jury did not adopt it because the jury placed undue weight on the royalty structure and rates in the Coe license.

It appears that Sun Studs did not assert at trial that it would have established a licensing structure based on the value to the ultimate user, but for the infringement. A reasonable jury could indeed have given weight to the fact that Sun Studs had not adopted such a royalty structure in its exclusive license to Coe Manufacturing. Although the license to Coe was entered into under the cloud of Applied Theory's infringement, these points were made to the jury. Sun Studs has not met its burden of showing that, on the evidence before it, the jury's verdict was unreasonable, or contrary to the weight of evidence. Determining the weight of the evidence is the province of the trier of fact. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606, 214 USPQ 1, 7 (1982). *See generally Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1234, 9 USPQ2d 1913, 1924 (Fed.Cir.1989).

Jury damage awards, unless clearly unreasonable or based on error in law, are not readily modified or retried. *Shatterproof Glass Corp.*, 758 F.2d at 628, 225 USPQ at 644; *Benigni v. City of Hemet*, 853 F.2d 1519, 1526 (9th Cir.1988) (damage award not overturned unless "grossly excessive, monstrous, or shocking to the conscience"). Reviewing the jury verdict on the relevant evidence, we conclude that a reasonable jury could have measured damages for patent infringement as did this jury. The judgment is affirmed, subject to recalculation, on remand, of damages to include those incurred during the period that had been excluded for laches.

The case is remanded for further proceedings consistent with this opinion.

### Costs

Costs on this appeal in favor of Sun Studs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

### ORDER

We held in *Sun Studs, Inc. v. ATA Equipment Leasing, Inc., supra*, 978, 993, 10 USPQ2d 1338, 1351 (Fed.Cir.1989), that the jury's finding of laches with respect to saw mills was not supported by substantial evidence, and ordered reversal. During the course of proceedings on rehearing, it became known that Sun Studs had not filed with the district court a motion for judgment n.o.v. on the issue of laches, although it had duly filed a motion for directed verdict on the issue.

This information was not before us at the time of our decision. However, now that it has come to our attention, justice requires that we consider it.

When a motion for directed verdict has been made but not followed by motion for judgment n.o.v., an appellate court that has determined that a jury verdict is not supported by substantial evidence ordinarily has authority only to order a new trial on the issue. *Johnson v. New York, New Haven & Hartford Railroad Co.*, 344 U.S. 48, 54, 73 S.Ct. 125, 128, 97 L.Ed. 77 (1952); *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1511, 220 USPQ 929, 934 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Smith v. Trans–World Drilling Co.*, 772 F.2d 157 (5th Cir.1985); 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 50.12 (2d ed. 1988). Accordingly,

IT IS ORDERED THAT:

We vacate that portion of our judgment that relates to the issue of laches with respect to saw mills, and remand for a new trial on this issue.