**Herbert JUDIN, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 573–89C.**

United States Court of Federal Claims.

Feb. 17, 1993.

Judd L. Kessler, Washington, DC, for plaintiff. Edwin Baranowski, of counsel.

Robert F. Altherr, Jr., with whom were Asst. Atty. Gen., Stuart M. Gerson and Vito J. DiPietro, Washington, DC, for defendant. John Fargo, of counsel.

Lawrence H. Pretty, Los Angeles, CA, for third-party defendant Telxon Corp. R.V. Lupo, of counsel.

William O. Geny, Portland, OR, for third-party defendant Videx, Inc.

Brian M. Dingman, Waltham, MA, for third-party defendant Computer Identics Corp.

George C. Summerfield, Washington, DC, for third-party defendant The Hewlett–Packard Co.

C. Larry O'Rourke, Washington, DC, for third-party defendant Unisys Corp.

## OPINION

BRUGGINK, Judge.

Plaintiff Herbert Judin claims that the United States has made use of his patented invention without providing just compensation. The patent at issue is U.S. Patent No. 3,656,832 (" '6,832 patent"). We have jurisdiction pursuant to 28 U.S.C. § 1498 (1988). The United States served notice to various third-party defendants in accordance with RCFC 14(c). Among those third party defendants is Hewlett–Packard Corporation ("HP"). HP and the United States have jointly filed the instant Motion for Partial Summary Judgment on the Issue of Non–Infringement. The two latter parties are referred to collectively as "defendants."

In light of the analysis below, the motion is granted with respect to all devices except the optical communications receivers. Section I below expounds the undisputed facts of record relied upon in reaching this conclusion. Section II applies the pertinent law to these facts.

## I. Facts.

### A. The '6,832 Patent.

Plaintiff received the '6,832 patent on April 18, 1972. According to its abstract, the device patented is an optical system utilizing uncorrected and unperfected single element lenses to form a diffraction limited point or line.

#### 1. The Patent Claims.

##### a. Independent Claims.

Plaintiff and defendant agree that the '6,832 patent contains three independent claims. They are as follows:

1. Method of forming an image having at least one micro-point comprising passing radiation from an optical fiber source through an optically uncorrected converging aspherical lens, and producing a diffraction limited image, said lens being placed about 3 mm or more from the fiber source and the lens having a diameter in the range of 1 to about 3 mm in its major axis.

. . . .

8. Method of providing a controllable size point image which is diffraction limited comprising passing radiation beam from an optical fiber source through an optically uncorrected converging lens, said lens being a plano-convex optical element, said lens being placed about 3 mm or more from the fiber source and having twice the radius of curvature of the convex surface being in the range of 1 to about 3 mm.

. . . .

10. Method of producing a fine point image for a surface probing or scanning device comprising passing radiation from an optical fiber source through a substantially spherical ball element being a diffraction limited uncorrected converging lens, said ball element being placed about 3 mm or more from the fiber source and having a diameter in the range of 1 to about 3 mm.

('6,832 patent, col. 5-6, ll. 1-26.)

##### b. Dependent Claims.

Plaintiff and defendant agree that the '6,832 patent contains eight dependent claims. Argument on this motion at times addressed dependent claim two. That claim is set out below:

2. The invention according to claim 1 wherein said step of passing radiation includes passing radiation through said uncorrected lens formed of a series of two substantially spherical ball elements, the first element being a beam divergence reducer for the succeeding element.

(*Id.*, col. 5, ll. 8-12.)

#### 2. Specification.

The first paragraph of the specification identifies the application for the patent at issue in this case as a streamlined application of serial number 727,384 filed February 26, 1968, which was a divisional application of serial number 419,512 filed Dec. 18, 1964. The 419,512 application issued April 23, 1968, as U.S. Patent No. 3,379,832 (" '9,832 patent"). The application for the '6,832 patent was filed June 3, 1970. The applicant, plaintiff in this action, claimed benefit of the earlier filing date, December 18, 1964, "under 35 U.S.C. §§ 120, 121 (1952)." ('6,832 patent, col. 1, ll. 5-7.)

The specification states that the invention relates to a "method and apparatus for point light source formation." (*Id.*, col. 1, ll. 10-11.) It summarizes the invention by describing it as using "optical fiber in combination with a small ball of glass acting as a diffraction limited lens." (*Id.*, ll. 49-51.) The specification goes on to point out that the glass ball need not be spherical within any large range of tolerance, and may even be aspheric or egg-shaped. (*Id.*, ll. 73-75.) The specification also identifies a further object of the invention as providing for the generation of light points "significantly independent of both spherical and chromatic aberration." (*Id.*, col. 2, ll. 15-17.)

#### 3. Prosecution History.

In procuring his patent, Mr. Judin made various statements to the patent examiner explaining his claimed invention. These statements may illuminate the meaning of

some terms used in the patent claim. Mr. Judin was aware of the representations made by his attorney to the patent office and actively participated in the prosecution of his own patent. Plaintiff concedes that his attorney at that time, Mr. Douglas, took no action on his behalf without plaintiff's approval.

In an action dated December 2, 1968, the examiner rejected the claims then numbered 54–60. (Def's Ex. B at 39 ("File Wrapper").) These claims evolved into the claims which issued. The examiner determined that the claims as then worded were obvious in light of U.S. Patent No. 3,166,-623 ("Waidelich") and U.S. Patent No. 3,315,310 ("Meltzer"). (*Id.* at 40.) Specifically, the examiner stated that both references disclosed a hemispherical or ball-shaped lens at the end of an optical fiber for producing a diffraction limited image. (*Id.* at 41.) In his response, the applicant offered the following observations to distinguish the prior art:

> [T]he Examiner should note that Waidelich does not disclose a single element type spheric lens, but a core and a shell arrangement forming the lens. This is a corrected type lens. What applicant discloses and claims is an "uncorrected lens" and this is merely a single lens element, and by definition is uncorrected in the optical sense, as Examiner is well aware. Thus, Waidelich is not useful by the Examiner to reject the claims, since this is a difference in lens structure of applicant's device over that of the corrected lens structure of Waidelich. The same is stated insofar as Meltzer may be applicable.

A further point of novelty in the claims is that they recite that the lens is optically uncorrected as to the converging characteristics of the lens and, further, that the lens produces a diffraction limited image. These two characteristics are the salient features that are not seen dis-

closed or suggested in the Waidelich and Meltzer references ...

(*Id.* at 50.)

The applicant also pointed out some unexpected results from using his invention, including the following:

> (1) A non-uniform object source is converted into a uniform symmetric image (airy disc) when the incident rays are in the paraxial ray range and the object source is small enough.
> (2) A diffraction predominant image is produced by an asymmetric or even egg-shaped single uncorrected lens element (when element dimension and refractive index values are met).

(*Id.* at 51.)

The examiner again rejected the application on June 17, 1969. (*Id.* at 58.)[1] The examiner maintained that Waidelich disclosed a single element lens and would produce an airy pattern. (*Id.* at 60.) He also stated that Meltzer disclosed an uncorrected element acting like the lens in the application. Additionally, the examiner stated that the invention was obvious in light of U.S. Patent No. 3,345,120 ("Palmer"). The examiner maintained that Palmer disclosed a similar use of optical fibers. The applicant's responses suggest distinctions from the art cited:

> It is well known that lenses can be of single element construction but not that they can produce diffraction limited performance. Waidelich never expected this possibility; otherwise [it] would have been explored in his patent as a possibility. Instead, he refers continually to the need for correction, as shown on pages 3 and 4 and all claims of his patent. He is never seen using the word "diffraction" anywhere in his patent.

(*Id.* at 66.)

> Meltzer is a non-imaging system which can never produce a diffraction limited point. The point is produced when adequate separation distance exists between light source (fiber end) and ball lens,

---

1. Plaintiff and defendant agree, apparently incorrectly, that this second rejection occurred

June 13, 1969.

when the lens is of proper dimension and refractive index.

Meltzer never intended point formation, since this is not the purpose of his device. Furthermore, knowledge that his system is uncorrected certainly precludes formation of diffraction limited point, unless it is set up as shown by applicant's invention.

Claims 54, 59, 60, 66 and 67 were rejected on Palmer. Palmer is a corrected system as he states on pages 3–5 of his patent. He does not claim diffraction limiting performance, and must therefore be discarded as a reference.

(*Id.* at 68.)

The application received a final rejection on November 24, 1969. (*Id.* at 70.) The examiner in his rejection letter said that although Waidelich, Palmer, and Meltzer might not explicitly include the term "diffraction limited" and did not include a discussion of diffraction limited performance, the fact that they utilized components of the same size as Mr. Judin made his invention obvious. (*Id.* at 71–73.) In response, Mr. Judin suggested these distinctions:

A simple lens concept was never mentioned in other than a minor way in the Waidelich prosecution. In fact, it is clear from a review of the prosecution of the Waidelich case that he stresses the need for a second lens element. Further, Waidelich does not confine or restrict his system in size, nor pay much attention to single lens elements, as in the present application. Waidelich does not review a refractive index dependency, and never uses the word "diffraction" in any of his disclosure or amendments during the prosecution of his patent. Also, he does not speak of a point of light formation technique, or any restrictions thereof relating to divergence angles, nor does he in any fashion treat the imperfect quality of sphericity of the lens capability, as disclosed and shown in the present application, within the standard of disclosure required by [35] U.S.C. [§] 112.

(*Id.* at 81.)

[T]he limited divergence angles incident upon the lens should not exceed approximately 10 or 12 degrees. This is certainly not cited or suggested by Waidelich or in any of the other cited references. This is an element of the description in the parent patent No. 3,379,832, page 4, paragraph 4, line 5, in which it is stated that over a 3 millimeter distance separation from the ball is necessary for operation, for defining divergence angle limits.

(*Id.* at 82.)

The Palmer reference uses optically correcting crossed fibers forming an astigmatic correction as per his discussion. He uses the cylindrical fiber lenses to provide points of light when acting together as a compound lens performance. It is a significant question as to whether the quality of the point image so formed is significantly correct and whether it is truly diffraction limited.

(*Id.* at 83.)

On May 4, 1971, the applicant received a rejection to his streamlined application, filed June 3, 1970. (*Id.* at 97–99.) The examiner still believed the claims unpatentable for obviousness in light of Waidelich, Meltzer, and Palmer. (*Id.* at 98–99.) The examiner noted that the Waidelich patent included a lens of the same size as that disclosed in the application claims which would become claims one and ten of the patent, and stated that Waidelich's single element lens would obviously produce a micro-point image as claimed. (*Id.* at 99.) The examiner further stated that Meltzer's lens was obviously uncorrected and of the proper size to accomplish the results set forth in the claim that was to become claim eight of the patent. (*Id.* at 99.)

In response, the applicant amended his claims on September 7, 1971, adding limitations to each of the independent claims which eventually became his patent. These amendments are set forth below, with deleted matter set forth in brackets and added matter italicized:

1. Method of forming [a micro-point or line] *an* image *having at least one micro-point* comprising passing radiation *from an optical fiber source* through an optically uncorrected converging *aspherical* lens, and producing a diffraction lim-

ited image, *said lens being placed about 3 mm or more from the fiber source and the lens having a diameter in the range of 1 to about 3 mm in its major axis.*

8. Method of providing a controllable size point image which is diffraction limited comprising passing radiation beam from an optical fiber source through an optically uncorrected converging lens, said lens being a plano-convex optical element, *said lens being placed about 3 mm or more from the fiber source and having twice the radius of curvature of the convex surface being in the range of 1 to about 3 mm.*

10. Method of producing a fine point image for a surface probing or scanning device comprising passing radiation from an optical fiber source through a substantially spherical ball element being a diffraction limited uncorrected lens, *said ball element being placed about 3 mm or more from the fiber source and having a diameter in the range of 1 to about 3 mm.*

(*Id.* at 102–03.)[2]

The remarks accompanying these amendments recounted an interview between the examiner and the applicant (with his counsel present) on August 27, 1971. (*Id.* at 103.) These remarks included the following paragraphs:

Also during the course of the interview was pointed out the essentiality of defining the invention in terms of passing radiation from an optical fiber source through an optically uncorrected converging lens, the lens being placed about 3 mm or more from the fiber, and the lens having twice the radius of curvature, or a diameter in terms of the major axis thereof in the range of 1 to about 3 mm.

These features being characteristic of the diffraction limited image through an optically uncorrected converging lens positioned from an optical fiber source are features and steps not found or suggested in any of the cited references of Waidelich, Meltzer, or Palmer.

It is seen that the claims define what the applicant regards as his invention, and none of the references taken singly or in combination teaches or suggests that it is obvious to one skilled in this art to combine any of these references to obtain what is set out in the claims of the application.

(*Id.* at 104.)

Additionally, in a supplemental amendment concurrently filed September 7, 1971, the applicant offered, inter alia, the following two claims:

14. Method of forming an image having at least one micro-point comprising passing radiation from a source through an optically uncorrected converging lens, said lens being of single element construction having twice its radii of curvature of at least one surface within the range of 1 to about 3 mm and being placed at about 3 mm or more from the source of radiation in order to produce a diffraction limited image.

15. Method of controllable size point image-forming of light according to claim 3 wherein said step of passing radiation includes use of a pinhole source passing radiation through said lens of single element construction.

(*Id.* at 105–06.)[3]

In remarks submitted accompanying the supplemental amendments, the applicant stated that claim fourteen "sets forth the basic invention." (*Id.* at 106.) This proposed claim would not have limited the invention to an optical fiber source.[4]

Mr. Judin has accompanied his affidavit on this motion with several letters which passed between himself and Mr. Douglas, the attorney who prosecuted the patent at

---

**2.** In the file wrapper the comma's preceding the added phrases were not underlined.

**3.** The reference to "claim 3" in proposed claim fifteen is to claim three of the application. This application claim became claim ten of the patent as issued.

**4.** Plaintiff is wrong in the unsupported assertion in his Statement of Genuine Issues at ¶ J6 that proposed claim fourteen was dependent on apparatus claim ten.

issue.[5] In these communications, Mr. Judin proposed the language used in claim fourteen of the supplemental concurrent amendment dated September 7, 1971. (Letter from Judin to Douglas of 9/1/71.) He stated in this letter that he believed the new claim to be the broadest claim of all. In reply Mr. Douglas cautioned, "The *pinhole source may not be entered* as it is *not clearly found in the specification* and may therefore be considered by the examiner *as new matter,* although inherent." (Letter from Douglas to Judin of 9/7/71 (emphasis in original).) A handwritten "note" at the bottom of that letter contends that a pinhole source is well known. Later Mr. Judin's attorney informed him, "Claim 14 is objected to, since any source is too broad in view of the specification and should be limited to—a fiber source—." (Letter from Douglas to Judin of 9/15/71.) The letter goes on to confirm that the applicant agreed to cancel proposed claim fourteen as too broad, in order to get allowance of his other claims.

In a correspondence dated September 24, 1971, the examiner finally allowed the patent. However, he conditioned this allowance, inter alia, on the cancellation of claims fourteen and fifteen which had been added by the amendment of September 7, 1971. The letter stated:

> This application is in condition for allowance and the following changes have been made therein by the examiner. Should the changes be unacceptable to applicant, an appropriate amendment may be proposed *after the Notice of Allowance has been received as provided under Rule 312.* To ensure consideration of such an amendment, it must be submitted on or before remittance of the Minimum Issue Fee.

(File Wrapper at 107 (emphasis in original).) Mr. Judin's attorney agreed to these changes. (*Id.*)

#### 4. Relevant Art.

The government identifies the area of technology relevant to the '6,832 patent as "optical design." Plaintiff disputes this

conclusion, stating that the relevant area is "optical physics." Mr. Judin further defines "optical physics" as "the science related to the phenomena of light and radiation" and asserts, "The ['6,832] invention represented an advance in the art of optical design because it involved a discovery in optical physics that could practically be applied in the design of useful optical devices." Plaintiff's description of the relevant area of technology lies within the shadow of the area referred to as laws of nature. Fundamental laws of nature are unpatentable. *See* 35 U.S.C. § 101 (1988); *Diamond v. Diehr,* 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978); *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). We consider the relevant art to be optical design, in accord with the government's proposal. While disagreeing over the exact name of the relevant art, plaintiff and defendant agree that one of ordinary skill in the relevant art would have a Bachelor's Degree in Physics with a curriculum strong in optics and electromagnetic physics, or equivalent training, and three to five years experience in optical physics or optical design.

#### B. Accused Devices

Plaintiff generally named three classes of infringing devices in the Plaintiff's Claims Chart filed under Order of the Court of July 23, 1991. The accused devices are (1) wands for reading bar codes, (2) optical communication transmitters and receivers, and (3) laser ordinance detonation devices. Since HP neither manufactures nor sells the laser detonation device, this dispositive motion does not concern those devices.

#### 1. Bar Code Wands.

Among the devices which plaintiff claims infringe his patent are several optical scanning "wands" which HP manufactured and the government purchased. These wands

---

**5.** Of course, these letters are not technically part of the prosecution history. However, they do shed some light on plaintiff's intent in amending his application.

are used to read bar codes. As part of that process, they project a point of light onto the surface containing the code. It is this projection of light onto the surface which plaintiff believes to infringe his patent. The wands also detect light reflected from the bar codes and convert it into a digital signal. Plaintiff does not contend the latter function of the accused devices infringes his patent.

### a. Wands Without a Ball Tip.

HP identifies one scanner it manufactures as the HEDS–3000. This scanner does not contain a sapphire tip and is representative of other scanners HP manufactures which do not contain a sapphire tip. In his Statement of Genuine Issues, plaintiff concedes that these devices do not infringe his patent. Hence, summary judgment is appropriate with respect to this device and any other wands which do not include ball tips.

### b. Wands With a Ball Tip.

The initial source of light in all the wands is a light emitting diode ("LED").[6] Masks and baffles absorb some of the light the LED emits. The rest is incident upon a highly-corrected, precision aspheric lens. After passing through this lens, the light next passes through a hyperbolic lens. When it exits the hyperbolic lens, the light beam is converging. This convergent beam of light next passes through a hermetic dust sealing window. The window is a flat piece of glass which provides no additional optical power. After passing through the window, the beam of light shines upon the sapphire tip of the wand. This sapphire tip may be in the form of a complete sphere or a sphere with the back and sides cut off, which may be referred to as a plano-convex tip. Figure 1 shows the wand with a plano-convex tip. If the sap-

phire tip were not present, the focal point of the beam of light would fall within the area occupied by the tip. Parties agree that the flat rear surface of the plano-convex tip provides no optical power. However, from the drawings the parties have submitted it is clear that when the beam of light strikes the rear surface of the window, its convergence is temporarily reduced. The focal point of the wand is the front spherical surface of the ball tip. The tip touches the front of the paper containing the bar code to be scanned. The paper reflects the beam of light when it reaches the spherical surface of the wand's tip.

Plaintiff admitted in oral argument that the accused bar code scanners do not contain a optical fiber in the conventional sense of that term, as it refers to either a clad or unclad filament of glass. Plaintiff's claim that these devices literally infringe his patent is contingent upon an expansive definition of the term "optical fiber." He acknowledges that the ordinary meaning of the term "optical fiber" to one of ordinary skill in the relevant art would not be as expansive a definition as that which plaintiff advances.

### 2. Optical Communication Devices.

Optical communication devices use optical fiber technology to transmit and receive optical signals in the form of light pulses. An optical communications system consists of two devices: a transmitter and a receiver. The transmitter converts information contained in some other medium, such as electrical signals, to light pulses and emits these pulses along an optical fiber. The receiver takes these pulses from the optical fiber and translates them back into electrical signals.

---

**6.** An LED is "[a] rectifying semiconductor device which converts electric energy into electromagnetic radiation." A.A. Bergh, *Light–Emitting Diode, in* 10 *Encyclopedia of Science and Technology* 60 (Sybil P. Parker, ed., 6th ed. 1987). Another source defines a LED as "a semiconductor that converts electronic energy efficiently into spontaneous and noncoherent electromagnetic radiation at visible and near-infrared wavelengths by electroluminescence at a forward biased *pn* junction." *McGraw-Hill Dictionary of Scientific and Technical Terms* 915 (Daniel N. Lapedes, ed., 1978 2d ed.).

**Figure 1** The HP bar code scanner with plano-convex tip.

---

a. Receivers.

Figure 2 depicts one of the accused receivers. In the receivers, light enters the system from a fiber optic cable. This light then passes through a flat window. Although the flat window has no optical power, it does have a higher index of refraction than air, thus reducing the divergence of light while it is passing through it. The light then passes through a sapphire biconvex spherical lens element in the form of a complete sphere. The distance between the optical port and the ball lens is 2.47mm. The lens itself has a diameter of about 1.58mm, and an index of refraction of $n = 1.7597$. A convergent beam of light emerges from this lens and is in focus on a photodetector.

**Figure 2 The HP optical communications receiver.**

---

b. Transmitters.

Figure 3 depicts one of the accused transmitters. The transmitter contains an LED with a 75 micrometer active diameter. The LED emits light over a complete hemisphere; thus, the numerical aperture of the emitted beam is 1.[7] The light from this LED shines directly upon a sapphire biconvex spherical lens element in the form of a complete sphere. The lens is 0.47mm from the LED. After passing through the lens, light passes through an additional glass window which provides an hermetic seal, but no additional optical power. Light passing through this window then shines upon the optical port. From there, the optical fibers carry the light away from the system.

---

**7.** Plaintiff and defendant agree that "numerical aperture" means "the sine of the half angle of acceptance or illumination from the object or image multiplied by the index of refraction in which the object or image is immersed."

Figure 3 The HP optical communications transmitter.

## II. DISCUSSION

### A. Jurisdiction.

The theory behind this court's jurisdiction, under 28 U.S.C. § 1498(a) (1988), is that the government's unlicensed use of a patented item is a taking. *Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir.1984). Thus, the phrase "unauthorized use" would be more technically correct than the term "infringement." The legal standard, however, is the same. Although Court of Federal Claims practice differs in certain respects from other patent actions, *see id.*, the analysis with respect to infringement presents no significant distinctions. *Deuterium Corp. v. United States*, 16 Cl.Ct. 454, 459 n. 3 (1989).

### B. Summary Judgment

■■■ Defendants have moved jointly for summary judgment on the issue of non-infringement. Since infringement is a fact issue, the court must approach a motion for summary judgment on the issue of non-infringement with care proportioned to the likelihood of its being inappropriate. *S.R.I. Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir. 1985); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985); *Deuterium*, 16 Cl. Ct. at 458; *N.P.D. Research, Inc. v. United States*, 15 Cl.Ct. 113, 118 (1988). However, summary judgment is appropriate where claims do not read on the accused device to establish literal infringement and prosecution history estoppel precludes finding infringement under the doctrine of equivalents. *Jonsson v. Stanley Works*, 903 F.2d 812, 816 (Fed.Cir.1990); *Townsend Eng'g Co. v. HiTec Co.*, 829 F.2d 1086, 1089 (Fed. Cir.1987).

### C. Infringement

■■■ The burden of proving infringement by a preponderance of the evidence falls on the patentee. *Z.M.I. Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1582 (Fed.Cir.1988); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282 (Fed.Cir.1986). Establishing infringement is a two-step process. The first step is to properly construe the claims, which is a legal determination.

*Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed.Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991); *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed,* — U.S. ——, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Hybritech, Inc. v. Abbott Lab.,* 849 F.2d 1446, 1455 (Fed.Cir.1988); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 866 (Fed.Cir.1985). The second step is to determine whether the accused product includes each element of the properly construed claim. *Jurgens,* 927 F.2d at 1560; *Hormone,* 904 F.2d at 1562; *Z.M.I.,* 844 F.2d at 1578; *Martin v. Barber,* 755 F.2d 1564, 1566 (Fed.Cir.1985). The two steps are distinct. *S.R.I.,* 775 F.2d at 1118; *N.P.D.,* 15 Cl.Ct. at 118; *Lemelson v. United States,* 14 Cl.Ct. 318, 322 (1988).

### 1. Claim Construction.

 The following principles control the court's evaluation of the claim. Most importantly, claim interpretation is a question of law. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir. 1992); *Senmed, Inc. v. Richard–Allan Medical Indus., Inc.,* 888 F.2d 815, 818 (Fed.Cir.1989). A dispute as to this legal issue does not preclude summary judgment. *Intellicall,* 952 F.2d at 1387; *Howes v. Medical Components, Inc.,* 814 F.2d 638, 643 (Fed.Cir.1987); *George v. Honda Motor Co.,* 802 F.2d 432, 434 (Fed.Cir.1986). Where no underlying factual issues must

be resolved, an infringement claim is amenable to summary judgment. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990); *Johnston v. I.V.A.C. Corp.,* 885 F.2d 1574, 1579–80 (Fed.Cir.1989). Interpreting a term within a claim is also a question of law. *Hormone,* 904 F.2d at 1563 n. 7; *Johnston,* 885 F.2d at 1578–80.[8] Mere contention over the meaning of a term does not raise a genuine issue of material fact so as to preclude summary judgment. *Intellicall,* 952 F.2d at 1387; *Becton,* 922 F.2d at 797. "This is true even where the meaning cannot be determined without resort to the specification, the prosecution history or other extrinsic evidence provided upon consideration of the entirety of such evidence the court concludes that there is no genuine underlying issue of material fact." *Johnston,* 885 F.2d at 1579. However, "[i]f complex scientific principles are involved or expert testimony is needed to explain a disputed term, for example, then an underlying factual question may arise which makes summary judgment inappropriate." *Howes,* 814 F.2d at 643; *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 672 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Still, *Howes* went on to hold that interpretation of a claim with reference to the specification "remains a question of law." *Howes,* 814 F.2d at 643. Application of these principles shows that certain points on which plaintiff and defendant disagree are not genuine issues of material fact.[9]

---

**8.** An often quoted passage from *Perini American, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581 (Fed.Cir.1987), suggests that a fact issue arises in claim interpretation whenever there is a dispute as to the meaning of a term. *Id.* at 584; *N.P.D.,* 15 Cl.Ct. at 118. Plaintiff, in his Memorandum in Opposition, relies on this passage as set forth in *Lemelson,* 14 Cl.Ct. at 332. The Court of Appeals for the Federal Circuit limited the effect of this passage in *Johnston,* 885 F.2d at 1579. Claim construction presents a question of fact only when "there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claims interpretation." *Id.* In light of the Federal Circuit's limitation of the authority upon which the Claims Court relied in its earlier decision, the passage that plaintiff cites is less persuasive than it might otherwise be.

**9.** Defendant states that "paraxial region" means an infinitesimal, threadlike region about the optical axis. Plaintiff disputes this definition. In support of this dispute, plaintiff cites to figure one and claim six of the patent. The term "paraxial region" does not appear in either location. The specifications' discussion of figure one in the '6,832 patent does mention that incoming ray angles approach the paraxial region. ('6,832 patent, col. 3, ll. 12–13.) Plaintiff also cites to Warren J. Smith, *Modern Optical Engineering* 20 (2d ed. 1990). That source identifies the "paraxial region" as "an infinitesimal thread-like region about the optical axis." Smith, *supra,* at 20. Plaintiff has failed to raise a genuine issue inasmuch as the source plaintiff cites gives the same definition as that offered by defendants. Nor is the issue material in the context of this motion. The term "paraxial" does not

■ The court should normally interpret terms in claims according to the ordinary meaning ascribed them by one of skill in the relevant art. *Intellicall*, 952 F.2d at 1387; *Jonsson*, 903 F.2d at 820. However, the ordinary meaning is not dispositive without reference to the specification and prosecution history. *Z.M.I.*, 844 F.2d at 1580. Indeed, the court may consider a host of factors. *McGill*, 736 F.2d at 673. Claim interpretation requires consideration of the specification, the prosecution history, the claims themselves (both asserted and unasserted), prior art and sometimes other extrinsic evidence, such as expert testimony or texts, such as dictionaries. *Hormone*, 904 F.2d at 1562; *Jonsson*, 903 F.2d at 817; *Senmed*, 888 F.2d at 818; *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 867 F.2d 1572, 1574 (Fed.Cir. 1989); *Z.M.I.*, 844 F.2d at 1580; *Mannesmann*, 793 F.2d at 1282; *Loctite*, 781 F.2d at 867; *S.R.I.*, 775 F.2d at 1117 n. 11; *McGill*, 736 F.2d at 673–75; *Lemelson*, 14 Cl.Ct. at 322. A review of other claims may provide significant evidence regarding the scope of a claim in issue. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.Cir.1983). The court should also consider as relevant all representations made during the prosecution history, including amendments and arguments. *Jonsson*, 903 F.2d at 818. The prosecution history limits claim interpretation by eliminating from consideration meanings disclaimed or disavowed during the prosecution. *LaBounty*, 867 F.2d at 1574; *Z.M.I.*,

844 F.2d at 1580. The specification is important because language must be used consistently in the claims and the specification. *Z.M.I.*, 844 F.2d at 1580; *McGill*, 736 F.2d at 674. Also, courts may refer to general and specialized dictionaries in construing terms. *See Fromson*, 720 F.2d at 1571. A claim is not construed in light of the accused device, nor are they construed so as to "cover" or "not cover" the accused device. *S.R.I.*, 775 F.2d at 1118.

#### a. Claim One.

1. Method of forming an image having at least one micro-point comprising passing radiation from an optical fiber source through an optically uncorrected converging aspherical lens, and producing a diffraction limited image, said lens being placed about 3 mm or more from the fiber source and the lens having a diameter in the range of 1 to about 3 mm in its major axis.

('6,832 patent, col. 5, ll. 1–7.)

■ The preamble is that portion of the claim preceding the word "comprising." Although words appearing in the preamble to a claim are normally disregarded, they are limitations of the claim where they "breath[ ] life and meaning into the claims." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989); *Loctite*, 781 F.2d at 866. No litmus test exists. The import of the preamble can be determined only in light of the patent as a whole, including the specifications. *Corning*, 868 F.2d at 1257. In

---

appear in any of the claims, and the court has not considered it a limitation.

Plaintiff and defendant also disagree as to the type of image the claimed invention produces. They start out in agreement as to the definition of the term "optical image." The term is intended to mean a likeness of an object formed by electromagnetic radiation propagating from the source region to the image region. Points in the light source correspond one-to-one to small regions in the image space. Plaintiff disputes that portion of defendant's Proposed Finding of Fact, ¶ G3, which states, "No such one-to-one correspondence exists in an optical system forming a diffraction limited system." The source upon which defendant relies states that in an image which approximates the size of a diffraction pattern in a diffraction limited system, no one-to-one correspondence exists. (W.

Smith Decl. ¶ 15.) However, apparently larger images which are diffraction limited may exhibit such a one-to-one correspondence. (Wolken Aff. ¶ 7.ii.) A source of any shape "is transformed into a symmetrical circle" only when the image size approaches the wavelength of light. (Judin Dep. at 199.) Defendant has argued that diffraction limited images are inherently very small and that they are not real images. However, the disagreement between plaintiff and defendant is not a genuine issue of material fact. The term image appears in the body of claim one only. In claims eight and ten it appears in the preamble. The manner in which the court treats the term "diffraction limited" in construing the claims obviates the need to resolve any dispute as to this term. In the context of this motion, it is not material.

the context of this patent, the phrase "[m]ethod of forming an image having at least one micro-point" is merely precatory. The court does not view this phrase as imposing additional limitations on claim one.

The first language following the preamble is the phrase "passing radiation from an optical fiber source." The court will give the phrase "optical fiber source" its ordinary meaning unless plaintiff specially defined that term. Plaintiff contends that he did intend to adopt a special definition of "optical fiber source" as set forth in one of his prior patents. In patent '9,832 plaintiff stated, "As to the term 'optical fiber' as is used herein in its generic significance, it includes light pipes, and all of the now well known electromagnetic conveying means and the like." Plaintiff contends that this definition is incorporated by reference into the '6,832 patent and is sufficiently expansive to encompass a highly corrected lens used in conjunction with an LED or any pinhole type source. This contention is unpersuasive.

Plaintiff's only reference to the earlier patent comes in the opening statement of his specification:

This application is a streamlined application of Ser.No. 727,384, filed Feb. 26, 1968, which is a divisional application of Ser.No. 419,512, filed Dec. 18, 1964, now U.S.Pat.No. 3,379,832 issued Apr. 23, 1968, and benefit is claimed of the filing date of the forementioned first filed application under 35 U.S.C. §§ 120 and 121 (1952).

The purpose of this reference, as the context makes clear, is to gain the benefit of an earlier filing date under sections 120 and 121 of the Patent Act. Such a passing reference is not adequate, in and of itself, to incorporate special definitions set forth in the referenced patent. *In re De Seversky,* 474 F.2d 671, 674 (C.C.P.A.1973); *see also In re Lund,* 376 F.2d 982, 989 (C.C.P.A.1967) (holding a lone sentence similar to that used by Mr. Judin inadequate to

bring forward a specific part of the earlier patent's disclosure).

In *De Seversky,* the court rejected an inventor's claim that he incorporated by reference one of his previous patents into a later application labelled a continuation-in-part of the former. The inventive aspect of the application serial No. 723,810 ("the child") concerned use of a device called a Venturi inlet. The inventor, Alexander De Seversky, had disclosed the use of this inlet in patent 3,053,029 ("the grandparent"). Before receiving this patent, he had filed application serial No. 53,255 ("the parent"). The parent application was labeled a continuation-in-part of the grandparent, but it did not disclose the use of a Venturi inlet. The child application was labeled a continuation-in-part of the parent application, but it was not labelled a continuation-in-part of the grandparent. The inventor argued that since the parent application was a continuation-in-part of the grandparent, the disclosure of the Venturi inlet in the grandparent was incorporated by reference in the parent. The Court of Customs and Patent Appeals rejected this argument, holding:

To be sure, the statement that an application is a continuation-in-part, or a continuation, or a division, or in part a continuation of another application is in a broad sense a "reference" to the earlier application, but a mere *reference* to another application, or patent, or publication is not an *incorporation* of anything therein into the application containing such reference for purpose of the disclosure required by 35 U.S.C. § 112.

*De Seversky,* 474 F.2d at 674 (emphasis in original).

It is true, as plaintiff contends, that an inventor may be his own lexicographer, that is, he may use terms in a manner inconsistent with their ordinary meaning. *Intellicall,* 952 F.2d at 1387; *Jonsson,* 903 F.2d at 819; *Z.M.I.,* 844 F.2d at 1580; *Loctite,* 781 F.2d at 867; *Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 888 (Fed. Cir.1984); *Lemelson,* 14 Cl.Ct. at 322.[10]

---

10. Some cases in the Claims Court have stated, "The fundamental issue when determining the scope of a claim is how the inventor defined the terms of the claim." *N.P.D.,* 15 Cl.Ct. at 118; *Lemelson,* 14 Cl.Ct. at 322. This approach, if applied literally, might place too much empha-

This truism, however, does not avail plaintiff. The inventive license to coin new terms is subject to the limitation that the new definitions must be clear and unambiguous. *Intellicall*, 952 F.2d at 1387; *Jonsson*, 903 F.2d at 821; *Lear Siegler*, 733 F.2d at 889. They must appear from somewhere in the patent disclosure, *Intellicall*, 952 F.2d at 1387, and the patent specification must support the asserted definitions. *Jonsson*, 903 F.2d at 819; *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). The patentee must make the meaning of a term reasonably clear and use the term consistently with the patent disclosure. *Lear Siegler*, 733 F.2d at 889. "[E]xtrinsic evidence that the inventor may have subjectively intended a different meaning does not preclude summary judgment." *Intellicall*, 952 F.2d at 1387. In short, the place to define terms is in the patent specification, and the time to do so is prior to the patent's issuing. *Lear Siegler*, 733 F.2d at 889. "The litigation-induced pronouncements of [the patentee], coming nearly at the end of the term of his patent, have no effect on what the terms of that document in fact do convey and have conveyed during its term to the public." *Id.* The issue here is not whether Mr. Judin was entitled to define his own terms. He surely was. The question is whether he did so unambiguously within the scope of this patent and this specification. He did not.

The '6,832 patent is a continuation of a divisional application. Neither the '6,832 patent specification, nor the patent claims, nor the prosecution history gives notice that the patentee intends a wholesale incorporation of all language from his previous patent. If an applicant wishes to use specific language from the previous patent, he may include it in the divisional application. Mr. Judin availed

himself of that device extensively in the patent at issue. For example, he copied the paragraphs of the '9,832 patent which precede and follow the paragraph containing the definition of "optical fiber" verbatim into the '6,832 specification. His failure to similarly include the definition of "optical fiber" suggests that he did not intend to use the definition advanced in the '9,832 patent for interpreting the phrase "optical fiber sources" in the '6,832 patent.

Plaintiff's reliance on *Jonsson*, 903 F.2d at 819, is misplaced. *Jonsson* dealt with the interpretation of two patents in the context of an infringement analysis. One of these patents issued from an application that was a continuation-in-part of the application which produced the other patent. In construing the term "diffused light," which appeared in both patents, the court stated that "Claim 1 of the [later] patent, however, is to be construed in light of the specifications of the [later] patent and the [earlier] patent, of which the [later] patent is a continuation in part." This language does not establish the proposition that every patent which is related procedurally to an earlier application incorporates by reference all the language of the earlier application. The case at bar differs from *Jonsson*. The phrase "optical fiber source" does not appear in any of the claims of the '9,832 patent. The claims of the '9,832 patent are all apparatus claims having as one limitation "a plurality of optical fibers." The claims of the '6,832 patent are all method claims which have as one limitation an "optical fiber source." In *Jonsson*, exactly the same language appeared in both patents. Also, the later patent in *Jonsson* was merely a continuation-in-part of the earlier application. The '6,832 patent is a streamlined version of an earlier application, which in turn was a divisional application of a still

---

sis on the inventor's subjective intent. Although the inventor is free to define his own terms, his definition must be clear and unambiguous; if he does not provide a special definition, terms have their ordinary meaning given them by one of ordinary skill in the art. *Intellicall*, 952 F.2d at 1387; *Jonsson*, 903 F.2d at 821; *Lear Siegler*, 733 F.2d at 889. The court must give words in a

claim "their ordinary and accustomed meaning unless it appears that the inventor used them differently." *Jonsson*, 903 F.2d at 820; *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984); *Universal Oil Prods. Co. v. Globe Oil & Ref. Co.*, 137 F.2d 3, 6 (7th Cir.1943), *aff'd*, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

earlier application from which the '9,832 patent issued. The procedural posture in the case at bar is more closely akin to *De Seversky* than to *Jonsson*.

Another reason for concluding that the '6,832 patent does not incorporate the definition of the '9,832 specification is that the definition clause itself in the '9,832 patent limits the scope of that definition with the phrase "as used herein." That language would tend to limit the effect of the definition to the '9,832 patent. As stated above, the term "optical fiber source" does not appear anywhere in the earlier patent; the definition advanced in the '9,832 patent was offered for the term optical fiber "in its generic significance." The prosecution history of the '6,832 patent reveals that the limitation "optical fiber source" was added to claim one, for example, as late as the amendment of September 7, 1971. (File Wrapper at 102.) This late addition gives no indication that for a special and unusual definition of the term, one should refer to the specification and file wrapper of a different application, filed almost seven years earlier.[11]

Since plaintiff did not specially define the term "optical fiber source,"

proper claim construction requires resort to the relevant art. The ordinary meaning of the term "optical fiber source" would imply some sort of "clad or unclad glass[12] filament." (Transcript at 92.) Such a filament or ribbon serves as an optical wave guide. Light is directed by such a conventional optical fiber source through internal reflection. This brief definition is generally consistent with the dictionary meaning of a "long, thin thread of fused silica, or other transparent substance, used to transmit light." *McGraw–Hill Dictionary of Science & Technology, supra,* at 1131. Other sources give more elaborate, but still consistent, definitions:

> Flexible, transparent fiber device used either for image or information transmission, in which light is propagated by total internal reflection. In simplest form, the optical fiber or lightguide consists of a core of material with index of refraction higher than the surrounding cladding.

Suzanne R. Nagel, *Optical Fiber, in* 12 *Encyclopedia of Science & Technology, supra,* 414. As its first limitation, then, claim one requires a filament of clad or unclad material capable of conveying light by means of internal reflection.[13]

---

**11.** Even if the definition from the earlier patent were adopted, it is far from clear that the meaning would be as broad as plaintiff suggests. It seems likely from the context that plaintiff merely intended to include such devices as optical ribbons which might not literally be "fibers," but which certainly "convey" light. *See generally* Yasuhara Suematsu & Ken-ichi Iya, *Introduction to Optical Fiber Communications* 122 (1982) (stating that an optical fiber has a different geometry from a planar waveguide in that the optical fiber is cylindrical). While the definition advanced in the '9,832 patent should encompass some sort of waveguide, it is not at all clear that it includes everything which "conveys" light in the broadest sense of the term convey. Obviously, light can travel through many media, including air and vacuum. It may be true that in one sense the sun "conveys" light to the earth, but that does not mean that the sun could be considered an optical fiber source in the context of this patent. Under such a reading, anything transparent would fall within the definition of "optical fiber," thus effectively eliminating that term as a limitation of the claim. As discussed below, the prosecution history limits what plaintiff may claim. Specifically, he may not claim a generalized point source.

**12.** The filament may be composed of any transparent media capable of conveying light by means of internal refraction, and need not be glass.

**13.** Also pending in this action is HP's Motion For an Order Deeming Hewlett–Packard's Request to Admit No. 39 Admitted Pursuant to Rule 36, RUSCC. The request to admit and plaintiff's response read as follows:

> 39. Do you admit that the definition of the term "optical fiber," as defined in U.S. Letters Patent No. 3,379,832, at column 3, lines 41–44, and as stated in the letter from Edwin Baronowski to George C. Summerfield of June 22, 1992, attached hereto as Exhibit A, is not *expressly* set forth anywhere in U.S. Letters Patent No. 3,656,832?
> RESPONSE
> No. To the extent that U.S. Letters Patent 3,656,832 is related to, as a continuation of the application which became U.S. Letters Patent 3,379,832, the definition of the term as intended by the inventor is incorporated by reference.

The court has carefully considered the briefs submitted on this motion. In light of our conclusions above with regard to the term "optical fiber source," the motion is DENIED as moot.

Claim one also requires the presence of "an optically uncorrected converging aspheric lens." This phrase contains four limitations: a lens, which is optically uncorrected, which is converging, and which is aspheric. We address each these limitations in order.

Neither the patent, in the claims and specification, nor the prosecution history provides a definition of the term lens. A lens is defined in optics as "a curved piece of ground and polished or molded material, usually glass, used for the refraction of light." Max Herzberger, *Lens in 9 Encyclopedia of Science and Technology, supra*, at 663; *McGraw–Hill Dictionary of Science and Technology, supra*, at 907. From this definition, it is clear that the function of refracting light is essential to a lens. Refraction is the "bending" of light which occurs when it passes between media of differing indexes of refraction.[14] Unless it serves this optical function in the particular system being considered, a device is not a lens, regardless of what it might do in another optical system. This understanding of the term lens is consistent with the prosecution history. The examiner requested the applicant to clarify his statement in the specification that the invention produced a light point by diffraction. (File wrapper at 59, 71.) Plaintiff's responses of record make clear that the invention's operation depends upon the refractive index of the media composing the glass ball. (File Wrapper at 80.) Thus, it is seen that the refraction of light by the ball lens is one aspect of the claimed invention.

The parties agree that a lens is uncorrected if it has not undergone corrective optical design measures. The purpose of this "corrective optical design" is to eliminate aberrations, such as coma, astigmatism, and chromatic aberrations. One method of correcting a lens is use of a compound lens, such as Waidelich discloses according to plaintiff. (File Wrapper at 40.)

To say that a lens is converging means, roughly, that it tends to collect the light it gathers and bring it into focus. A converging lens directs light toward a point. The opposite of a converging lens is a diverging lens, which tends to diffuse the light it collects.

The parties disagree over the meaning of the term "aspherical." Defendant insists that in the relevant art the term "aspherical", when used in reference to a lens, means a lens with an optically useful surface which is intentionally curved differently from the surface of a sphere. Plaintiff contends that the term means "deviating slightly from the spherical form." In support of that definition, plaintiff cites *Webster's Ninth New Collegiate Dictionary* 66 (1979). Some language in the specification, when read in context, indicates that plaintiff intended "substantially spherical" and "aspherical" both to mean "approximately in the shape of a sphere." In particular, plaintiff's statement in the specification that the ball "need not be spherical to within any high degree of tolerance and may even be aspherical or egg shaped" suggests this reading. The prosecution history suggests a similar reading by describing the imperfect ball lens as "asymmetric or even egg shaped." Within defendant's proposed reading of this term, an egg shaped lens would just be one type of asymmetric lens. Within plaintiff's proposed reading, the difference between what might be described as an asymmetric lens and an egg shaped ball would be one of degree. The latter meaning is more consistent with the quoted language.

Plaintiff did, however, choose to use different terms in claim one and claim ten. Other language in these claims suggests what these differing terms might mean. The final limitation of claim one is that the lens have "a diameter in the range of 1 to about 3 mm *in its major axis*." ('6,832 patent, col. 5, 11. 6–7 (emphasis added).) Claim ten requires that the lens have "a diameter in the range of 1 to about 3 mm."

---

**14.** One source defines refraction as "the change in direction of the propagation of any wave, such as an electromagnetic or sound wave, when it passes from one medium to another in which the wave velocity is different, or when there is a spatial variation in the medium's wave velocity." *McGraw–Hill Dictionary of Scientific and Technical Terms, supra*, at 1343.

Claim ten does not specify an axis along which to measure the diameter. Apparently, all diameters in claim ten are considered to be roughly the same. Since claim one specifies that the diameter be measured along the major axis, it apparently contemplates the presence of more than one axial length. It does not, however, require such. The court adopts plaintiff's interpretation.

It is apparent, then, that claim one calls for a curved piece of ground and polished or molded material roughly in the shape of a sphere which serves to refract light so as to direct it towards a focal point and which has not undergone corrective optical design measures.

■■■■ Claim one next contains the phrase "producing a diffraction limited image." One reading of claim one would treat this language as a limitation and restrict the method claimed to a method of "producing a diffraction limited image." However, for reasons given below in the construction of claim ten, the court does not conclude that Plaintiff intended this term as a limitation or that this term must be read as a limitation. To the extent that there may still exist a genuine dispute of fact as to the meaning of this term and the intent of the applicant in including it here in his claim, the court resolves that issue in favor of plaintiff and does not treat this term as a limitation for the purposes of this motion. A decision as to the meaning of the term "diffraction limited" is therefore not necessary.

■■■■ The remainder of the claim contains the limitations "said lens being placed about 3 mm or more from the fiber source and the lens having a diameter in the range of 1 to about 3 mm in its major axis." These limitations pertain to the sizes and positioning of various components of the system. Defendant urges a strict reading of these terms. Where one limitation of the claim is an approximate range, the numbers used in the claim may not be disregarded entirely. *Johnson & Johnson v. W.L. Gore & Assocs., Inc.*, 436 F.Supp.

704, 728–29 (D.Del.1977). The accused device infringes if one of ordinary skill in the art would read the range in the patent claim to include specific use in the accused device. *Id.* Where a claim is for a process, one limitation is a range of values, and the range is qualified with a modifier such as "about," operational limit of the process should be read more strictly than mere commercial limits. *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 82 (6th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). The court is not unmindful of these rules. Nevertheless, in the context of the present motion an overly strict reading of these terms is not justified. To the extent that interpretation of these limitations may raise genuine issues of fact, we resolve those issues in favor of plaintiff. Otherwise, these terms are material in the context of this motion only to the extent that they affect the construction of other terms of this and other claims.

### b. Claim Eight.

8. Method of providing a controllable size point image which is diffraction limited comprising passing radiation beam from an optical fiber source through an optically uncorrected converging lens, said lens being a plano-convex optical element, said lens being placed about 3 mm or more from the fiber source and having twice the radius of curvature of the convex surface being in the range of 1 to about 3 mm.

('6,832 patent, col. 6, 11. 9–15.)

The first phrase following the preamble in claim eight is "passing radiation beam from an optical fiber source through an optically uncorrected converging lens, said lens being a plano-convex optical element." [15] With respect to the term "optical fiber source," the analysis is the same as employed in claim one. The term means the same thing in the context of both these claims, and the meaning is that which one of ordinary skill in the art would attach to

---

**15.** The language before the word "comprising" is again considered preamble, not a limitation of the claim.

this phrase. No special significance is attached to the addition of the word "beam," as no special meaning has been suggested by the parties.

As in claim one, claim eight calls for an optically uncorrected converging lens. The analysis of claim eight is the same as that of claim one with respect to the terms "optically uncorrected," "converging," and "lens." The claim refers to a curved piece of ground and polished or molded material which serves to refract light so as to direct it towards a focal point and which has not undergone corrective optical design measures.

Claim eight differs from claim one in that the patentee replaces the term "aspherical" with the phrase "a plano-convex optical element" in describing the lens's shape. Defendant proposes to define "plano-convex optical element" in the context of claim eight of the patent to mean half balls of glass. In support of this definition it cites the language in the specification which states, "It is also within the scope of the present invention to use half balls of glass instead of spherical glass elements...." ('6,832 patent, col. 4, ll. 59–61.) Plaintiff contends that the term "plano-convex optical element" refers to an optical element in which one surface is convex while the opposite surface is substantially a plane.

 The definition proposed by defendant would adopt part of the specification as additional limitations of the claim. Although claims are construed in light of specifications, it is the claims which the accused device must infringe, not the specifications. *S.R.I.*, 775 F.2d at 1121. Expressions in the specifications should not be incorporated into the claims as additional limitations. *Constant*, 848 F.2d at 1571; *S.R.I.*, 775 F.2d at 1121; *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). The accused device is compared to properly construed claims, *N.P.D.*, 15 Cl.Ct. at 118, not to the preferred or commercial embodiment of those claims.[16] *Loctite*, 781 F.2d at 870; *S.R.I.*, 775 F.2d at 1121; *Martin*, 755 F.2d at 1567.

Thus, the adjective "plano-convex" describes the two surfaces of the lens: one is a plane (flat), and the other is convex (curved outward). Examples of plano-convex optical elements include a half ball of glass and a piece of glass shaped like a grain silo, being a half ball of glass on the end of a cylinder having the same diameter as the half ball. Of course, the element could be made of material other than glass, such as sapphire.

The remainder of the claim contains the limitations "said lens being placed about 3 mm or more from the fiber source and having twice the radius of curvature of the convex surface being in the range of 1 to about 3 mm." These limitations pertain to the sizes and positioning of various components of the system. The court construes these phrases similarly to the analogous provisions in claim one. To the extent that there may be any genuine issues regarding the terms underlying proper construction of these claims, the court resolves them in favor of plaintiff. Although important as limitations of the claim, these terms are useful in the context of this motion only to the extent that they may aid in claim construction.

---

**16.** In its motion for summary judgment, HP contends that because claims, not commercial embodiments are infringed, the patentee's reference to commercial embodiments of his patent are irrelevant. This is not entirely true. A preferred or commercial embodiment cannot be used to add limitations not included in the claims. Thus, it would be error to find that an accused device does not infringe the patent because of some dissimilarity between that device and the preferred or commercial embodiment, *if that dissimilarity is not a feature of the claim.* However, the specification necessarily embodies the use of the claimed invention. 35 U.S.C. § 112 (1988); *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *In re Gay*, 309 F.2d 769, 772 (C.C.P.A. 1962). Similarity between an accused device and the preferred embodiment is at least some indicia of infringement. However, since it is shown *infra* that the accused devices do not infringe because they do not meet all the elements of the claim it is not necessary to consider superficial similarities between embodiments of plaintiff's invention and the accused device.

#### c. Claim Ten.

10. Method of producing a fine point image for a surface probing or scanning device comprising passing radiation from an optical fiber source through a substantially spherical ball element being a diffraction limited uncorrected converging lens, said ball element being placed about 3 mm or more from the fiber source and having a diameter in the range of 1 to about 3 mm.

('6,832 patent, col. 6, 11. 20–26.)

The analysis of the limitation "passing radiation from an optical fiber source" in claim ten is substantially the same as that employed above for the identical phrase in claim one. The term means the same thing in the context of both claims one and ten (as well as claim eight), and the meaning is that which one of ordinary skill in the art would attach to this phrase.

The light from the optical fiber source must pass "through a substantially spherical ball element being a diffraction limited uncorrected converging lens." Again, as in the two claims analyzed above, one limitation is for a lens, which is "a curved piece of ground and polished or molded material, usually glass, used for the refraction of light." This lens must not have undergone corrective optical measures. It must be converging, that is, it must bring the light to a focus. It must be substantially spherical. The parties agree that the term "substantially spherical" as used in the '6,832 patent means "a sphere, such as a glass or sapphire ball."

Only claim ten describes the lens as "diffraction limited." In claim one, that adjective phrase was applied to the image formed by the method claimed. In claim eight, that language occurs in the preamble. The parties disagree over the meaning of the term "diffraction limited." Plaintiff is unwilling to adopt a definition more rigorous than to say it means an image of high quality. Defendant offers as a more precise definition, "an optical system whose resulting image is produced by a wavefront which is spherical to within one quarter of the wavelength of light." Although plaintiff acknowledges the accuracy of defendant's definition, he asserts, without support or explanation, that "the definition provided is not useful with reference to the issues of this action." Although plaintiff's response is not adequate to preclude use of defendant's definition, the issue is immaterial because the court concludes that, for purposes of this motion, it will not treat the phrase "diffraction limited" as a limitation of the claim.

Reading all the claims of the patent together, the court concludes that the phrase "diffraction limited" was intended to describe the results of the method claimed, not to serve as an additional limitation on the lens of claim ten. This may be a somewhat generous reading in favor of plaintiff, but, in the context of a summary judgment motion, it is not unwarranted. Read most broadly in favor of plaintiff, there may be an issue of fact as to whether the term "diffraction limited" was intended as a limitation of claim ten. Resolving that issue in favor of plaintiff and finding that the term is not a limitation, we discover that any factual issue presented is not material to this motion.

The remainder of the claim contains the limitations "said ball element being placed about 3 mm or more from the fiber source and having a diameter in the range of 1 to about 3 mm." These limitations pertain to the sizes and positioning of various components of the system. The court construes these phrases similarly to the analogous provisions in claims one and eight. However, we note that, unlike claim one, claim ten does not specify the axis along which to measure the diameter. To the extent that there may be any genuine issues regarding the terms underlying proper construction of these claims, the court resolves them in favor of plaintiff. Although important as limitations of the claim, these terms are useful in the context of this motion only insofar as they aid in claim construction.

#### d. Dependent Claim Two.

Defendant proposed that the '6,832 patent contains no support for the use of an uncorrected lens in the dual element system of claim two. Plaintiff disputed this proposed finding, stating, "Claim two re-

lates to 'two substantially spherical ball elements' which are uncorrected.'' Claim two depends on claim one. A dependent claim incorporates all the limitations of the claim on which it depends. 35 U.S.C. § 112 (1988). We construe claim two here only to the extent of noting, as plaintiff pointed out in his statement of genuine issues, that the two lenses of claim two are both uncorrected.

### 2. Application to the Accused Devices.

■■■■ After construing claims without reference to the accused device, the court applies the claims so construed to the accused device to determine whether the device infringes the claims. *S.R.I.*, 775 F.2d at 1118; *N.P.D.*, 15 Cl.Ct. at 118; *Lemelson*, 14 Cl.Ct. at 323. The same interpretation of the claims should be used in both the literal infringement analysis and also in the examination under the doctrine of equivalents. *Senmed*, 888 F.2d at 818. To establish infringement, the accused device must contain every limitation of the claim, either directly or by substantial equivalent. *Becton*, 922 F.2d at 798; *Johnston*, 885 F.2d at 1577; *Deuterium*, 16 Cl.Ct. at 460–61.

■■■■ Determination of infringement either literally or under the doctrine of equivalents is a question of fact. *Jonsson*, 903 F.2d at 821; *Sun Studs, Inc. v. A.T.A. Equip. Leasing, Inc.*, 872 F.2d 978, 986 (Fed.Cir.1989); *LaBounty*, 867 F.2d at 1575; *Townsend*, 829 F.2d at 1089; *Loctite*, 781 F.2d at 869. Deciding whether the claim reads on the accused device is also a question of fact. *Deuterium*, 16 Cl.Ct. at 460; *N.P.D.*, 15 Cl.Ct. at 118; *Lemelson*, 14 Cl.Ct. at 322. "A finding of equivalents is a determination of fact.'' *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950).

The two types of devices at issue are bar code reading wands and optical communication devices. Plaintiff has conceded that the optical communication devices HFBR–2204 Fiber Optic Receiver and HFBR–1202 Fiber Optic Transmitter are representative of all accused fiber optical interfaces. HP is the only third-party defendant identified by plaintiff as a manufacturer of optical communication devices. The discussion below of optical communication devices is thus applicable to all such devices at issue in this suit.

With regard to the bar code scanning wands, defendant asserts that three wands that HP manufactures are representative of all accused devices. Disputing this proposed finding, plaintiff states, "The bar code scanners are of several different internal configurations which include mask, baffle and aperture means, and HP scanners during the relevant infringement period used both full ball and partial ball.'' Inasmuch as some wands contain a plano-convex element and some wands a ball tip, the discussion below treats such wands separately. The two analyses employed are considered to apply, respectively, to all those wands with ball tips and to all those wands with plano-convex tips.

Plaintiff's contentions as to the differing internal configurations of masks, baffles, and apertures does not raise a material dispute. These additional features in the accused devices would not result in infringement in light of the analysis which follows. Since the court concludes that the term "optical fiber source'' must be given a restrictive reading in light of the prosecution history, the additional masks and baffles would not make the LED an equivalent to an optical fiber source. Also, since the court concludes that the accused devices do not have an uncorrected lens as called for by the patent, the HP wands would not infringe even if the additional masks and fibers did make the LED an equivalent to an optical fiber source.

#### a. Wands With Ball Tips.

##### (1) Literal Infringement.

■■■■ Plaintiff contends that these wands literally infringe claims one and ten of his patent. They do not. A claim must read on an accused device exactly to support literal infringement. *Johnston*, 885 F.2d at 1580. The court must analyze both the structure and the operation of the accused device. *N.P.D.*, 15 Cl.Ct. at 118; *Lemelson*, 14 Cl.Ct. at 323. Literal in-

fringement results if and only if the accused device embodies every element of the claim. *Z.M.I.*, 844 F.2d at 1578; *Townsend*, 829 F.2d at 1090; *Mannesmann*, 793 F.2d at 1282; *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257 (Fed.Cir.1985). The court, essentially, decides whether the accused device is the same invention the claims define. *Deuterium*, 16 Cl.Ct. at 460. Where the claim reads directly on the accused device, the court may disregard additional components or elements of the accused device if those additions do not produce a radically different result. *Becton*, 922 F.2d at 797; *Loctite*, 781 F.2d at 865.

■ The structure of the wands in question does not literally infringe. They do not literally meet the limitation of an optical fiber source which is present in each claim. The light source in the wands is an LED. An LED is not, literally, an optical fiber. An LED produces light from electrical impulses. An optical fiber is a filament which conveys light by internal reflection. An LED radiates light over a full hemisphere. An optical fiber emits light in a beam of reduced divergence. The numerical aperture of the light radiated from an LED is 1.0. The numerical aperture of light radiated from the "optical fiber source" called for in the patent is down in the range of about 0.15.

■ The operation of the wands at issue also does not infringe. The ball tip does not serve as a lens. It is certainly true that a bead of sapphire can serve as a lens. However, in this device, it does not. The light is already converging when it strikes the rear of the sapphire bead. The light is actually in focus on the front of the bead. A lens is "a curved piece of ground and polished or molded material used for the refraction of light." The phenomena of refraction occurs at the boundary of two media. The light in the accused devices never passes the front boundary of the sapphire tip. It is at exactly that boundary that the light is reflected back to the detector. Therefore, any refractive effect of the sapphire tip occurs only at the rear boundary, and is minimized by the fact that light is already converging to a focal point when it passes that boundary.

The court agrees with HP that merely because an element is in the light path does not make it a lens. HP is using these sapphire tips for mechanical purposes and as a dust seal, not to bring the light beam into focus. Plaintiff's argument that the sapphire tip on these wands is a dust seal only in the sense that a camera lens is a dust seal is unpersuasive. A camera lens refracts the light passing through it to bring it into focus on the photographic plate. It is that refraction which makes the piece of glass in a camera a lens. As noted above, the ball tips on these wands do not refract light so as to bring it into focus. HP has placed the tips on these wands at a point where the light was already focused so as to prevent the tip from acting as a lens.

Nor has HP adopted the position that the sapphire tip is not a lens merely in response to this litigation. In the patent HP received on the sapphire tip, HP emphasized that any optical effect is minimized. The point of the tip is mechanical. It serves to prevent dust from entering the unit and to keep the paper at the focal point of the beam.

The wands accused in this suit thus do not contain all limitations of claims one and ten. The invention claimed is not the same as the device accused. Because certain elements are missing, there can be no finding of literal infringement.

■ Dependent claim two is not infringed because there is no optical fiber source.[17] Additionally, the combination of

---

17. Dependent claims incorporate all the limitations of the independent claim on which they depend. 35 U.S.C. § 112 (1988); *Teledyne McCormick Selph v. United States*, 214 Ct.Cl. 672, 558 F.2d 1000 (1977). Thus, a device which infringes no independent claim cannot infringe any dependent claim, except in certain unusual situations. Plaintiff has not contended that such a situation exists here. Because the accused devices do not infringe claim one, which is independent, they do not infringe claim two, which is dependent on claim one. Since plaintiff has argued that the accused devices infringe

lenses and the sapphire tip in the accused devices is not the same as the combination of two ball lenses in claim two because the lenses in the accused devices are highly corrected whereas both the lenses in claim two are uncorrected. Therefore, the accused devices do not infringe claim two of the patent.

### (2) Doctrine of Equivalents.[18]

■■■ The doctrine of equivalents is an equitable doctrine, providing the patentee with a remedy when the claim does not read literally on the accused device but relief is still appropriate because it satisfies the limitations equivalently. *Johnston*, 885 F.2d at 1580–81; *Z.M.I.*, 844 F.2d at 1581. Application of the doctrine involves striking a balance between two competing public policies: preventing a fraud on the patent and the public's need for reasonable certainty as to the patent's scope. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991); *Sun Studs*, 872 F.2d at 987–88. The claims must be distinct and definite enough to give the public notice of their scope. *London*, 946 F.2d at 1538. Application of the doctrine of equivalents is the exception, not the rule; it is not intended to be simply a second prong of every infringement charge. *Id.*

■■■ As a preliminary matter, then, this court must determine whether application of the doctrine of equivalents is even appropriate in this case. The parties have not addressed this matter extensively, and review of the law has provided little concrete guidance as to when the doctrine should be applied. It is clear that "pioneering" inventions are entitled to a broad range of equivalents. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987). It is not clear from the record whether Mr. Judin's invention was in fact pioneering. A mere

assertion that an invention is a pioneer invention is not an adequate substitute for evidence establishing that the invention is pioneering in nature. *Id.* Moreover, there is not a separate body of law for "pioneer" inventions. *Sun Studs*, 872 F.2d at 987. The question is one of degree, with inventions which represent more substantial breakthroughs being entitled to a commensurately larger scope of equivalents. *Id.* The extent to which an invention is considered pioneering is a question of fact. *Id.* The mere fact that an invention is commercially successful and has some industry impact does not compel a finding of infringement. *Perkin–Elmer*, 822 F.2d at 1532. Inasmuch as genuine issues of material fact may exist with respect to this issue, we resolve this preliminary matter in favor of the non-movant and assume the applicability of the doctrine of equivalents.

■■■ An accused product infringes a claim under the doctrine of equivalents "if it performs substantially the same function, in substantially the same way, to obtain the same result." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856; *Becton*, 922 F.2d at 797; *Hormone*, 904 F.2d at 1564; *Jonsson*, 903 F.2d at 821; *Johnston*, 885 F.2d at 1581; *Corning*, 868 F.2d at 1258. The equivalent need not have been known at the time of invention to infringe. *Johnson & Johnson*, 436 F.Supp. at 728–29. Concomitantly, a patentee cannot appropriate by equivalents a device known to the prior art. *Senmed*, 888 F.2d at 821; *Loctite*, 781 F.2d at 870. Application of the traditional tripartite test is somewhat problematic in the context of the patent at issue. All of the claims of the '6,832 patent are "method" claims.[19] Thus, all that has actually been claimed is the method by which a thing is accomplished. In applying the traditional threefold analysis of *Graver*

claim two through the use of two lenses, we briefly address this contention.

**18.** Decisions seem to refer to this doctrine interchangeably as the doctrine of "equivalents" and the doctrine of "equivalence." *Deuterium*, 16 Cl.Ct. at 460 n. 5. In accord with *Deuterium*, we will use the former designation. This usage reinforces the notion that test is whether there

is an "equivalent" to each limitation, not whether there is "equivalence" in general between what the patentee claims and the device he accuses.

**19.** Each claim describes a "method." These are not "means" claims as that term is used in its restrictive sense in the fifth paragraph of 35 U.S.C. § 112 (1988).

*Tank*, the court has been careful not to read a function or a result into the claims as additional limitations. Nevertheless, the court concludes that the accused devices do not infringe the '6,832 patent because the means these devices employ in performing their function and obtaining their result is not the same as that claimed in the '6,832 patent.

 The accused device must infringe each element, at least by substantial equivalent. *Intellicall,* 952 F.2d at 1389; *London,* 946 F.2d at 1538; *Jurgens,* 927 F.2d at 1560; *Becton,* 922 F.2d at 798. A substituted element which substantially changes the way the claimed invention performs its function is not a substantial equivalent. *Perkin–Elmer,* 822 F.2d at 1533. The term "element" in the context "element of a claim" means limitation; in another context, the term may refer to some structural part of the accused device or of some invention embodying the claim. *Id.* at 1533 n. 9. Every limitation of the claim must have an equivalent within the accused device, although it need not necessarily have a corresponding component. *Corning,* 868 F.2d at 1259. A single structure in the accused device may perform the functions of two or more claim limitations. *Sun Studs,* 872 F.2d at 989. Thus, there need not be a one-to-one correspondence of components. *Id.*

> As the Federal Circuit has held,
> Our law requires the patentee to specify particularly what he claims to be new, and if he claims a combination of certain elements or parts, we cannot declare that any one of these elements is immaterial. The patentee makes them all material by the restricted form of his claim. We can only decide whether any part omitted by an alleged infringer is supplied by some other device or instrumentality which is its equivalent.

*Becton,* 922 F.2d at 798 n. 3 (quoting *Union Water Meter Co. v. Desper,* 101 U.S. 332, 337, 25 L.Ed. 1024 (1880)); *see also Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 949–54 (Fed.Cir.1987) (Nies, J., concurring), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *and*

*cert. denied,* 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988).

> [A] court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement. Nor ... should a court convert a multi-limitation claim to one of two limitations to support a finding of equivalency.

*Perkin–Elmer,* 822 F.2d at 1532.

 The statement that it is legal error not to apply the doctrine of equivalents to the claimed invention as a whole, *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1364 (Fed.Cir.1983), does not justify treating some claim limitations as insignificant or unimportant. *Perkin–Elmer,* 822 F.2d at 1532–33. The court in *Perkin–Elmer* recognized that some dicta in prior decisions stated that considering the "essence", "gist", or "heart" of an invention might be helpful in infringement analysis. *Id.* at 1533 n. 8. However, no claim limitation may be regarded as insignificant or immaterial in infringement analysis. *Id.*

 The accused devices are not equivalent to the claimed invention because at least two elements are not present. The accused devices do not contain the equivalent of an optical fiber source in the sense to which the prosecution history limits that element. The accused devices also do not contain the equivalent of an uncorrected converging lens in the sense required by the patent.

 The prosecution history in this patent limits what plaintiff may claim as equivalent to an "optical fiber source." The patentee may not recapture by equivalents what he has given up either by argument or by amendment. *Hormone,* 904 F.2d at 1564; *Jonsson,* 903 F.2d at 817; *Senmed,* 888 F.2d at 821. Prosecution history estoppel is an equitable tool for determining the permissible scope of patent claims. *Mannesmann,* 793 F.2d at 1284;

*Builders Concrete,* 757 F.2d at 258.[20] As such, it serves to limit the doctrine of equivalents. *Hormone,* 904 F.2d at 1564; *Jonsson,* 903 F.2d at 821; *Townsend,* 829 F.2d at 1090.[21] Its application is a question of law. *LaBounty,* 867 F.2d at 1576. The doctrine is applicable even where the claims at issue were not amended in the course of the patent application. *Builders Concrete,* 757 F.2d at 260. "Material representations made to the PTO in response to references cited by the PTO, with the result that the scope of the patent claims is changed in order to obtain the patent grant, are pertinent to the subsequent determination of the permissible scope of the patent claims." *Id.* at 258. The patent's prosecution history includes the entire record of proceedings in the PTO, including statements made to the Examiner. *Jonsson,* 903 F.2d at 817.

■■■■ In order to receive his patent, plaintiff cancelled and amended various claims. Included among these modifications were the addition of the optical fiber source to claim one, the cancellation of a proposed claim fourteen which did not specify the type of light source, and the cancellation of proposed claim fifteen which explicitly mentioned a pinhole source. Not every amendment, however, serves as an estoppel. *Hormone,* 904 F.2d at 1564; *Sun Studs,* 872 F.2d at 987; *LaBounty,* 867 F.2d at 1576; *Loctite,* 781 F.2d at 871; *Hughes Aircraft,* 717 F.2d at 1362–63. The court must inquire not only into what was changed, but also the reason for the change. *Hormone,* 904 F.2d at 1564; *Sun Studs,* 872 F.2d at 987; *Loctite,* 781 F.2d at 871. In determining the reason for the change, and thus the extent of the estoppel, the court must consider both the prior art and the representations made to the examiner. *Sun Studs,* 872 F.2d at 987; *Mannesmann,* 793 F.2d at 1284–85. "Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero." *Hughes Aircraft,* 717 F.2d at 1363. For example, where a limitation in a patent involves a range of values, the court must determine whether the limits of the range were added to distinguish prior art or merely represented what was then commercially feasible. *Johnson & Johnson,* 436 F.Supp. at 728–29.

■■■ The court realizes that a determination of plaintiff's intent in making or allowing these amendments is factually sensitive. However, the record in this matter makes clear that plaintiff made these changes with the intent of overcoming prior art objections propounded by the examiner. To focus our inquiry, we note that on the issue of the applicant's intent in amending his claim the emphasis should not be on the validity of the patent examiner's objection for prior art but rather on whether the patentee amended his claim with intent to overcome those objections. If the examiner's objections were not valid, the patentee had a remedy available in the form of reissue under 35 U.S.C. § 251. Also, the examiner told plaintiff when the patent issued that he could still propose amendments if the changes made in condition of allowance were unacceptable. Both of these remedies, however, are subject to strict time limits. Reissue to expand the scope of claims must occur within two years of issuance. 35 U.S.C. § 251. Any additional proposed amendments should

---

**20.** The statements and arguments in the prosecution history are also used to interpret claims. That use, however, is distinct from prosecution history estoppel. Claim interpretation precedes a determination of literal infringement. After the court properly construes the claims and finds no literal infringement, prosecution history estoppel serves as a limitation on applying the doctrine of equivalents. *Loctite,* 781 F.2d at 870; *McGill,* 736 F.2d at 673.

**21.** The doctrine of equivalents comes into play after a finding of no literal infringement. *Graver Tank,* 339 U.S. at 607, 70 S.Ct. at 855 ("[R]esort must be had in the first instant to the words of the claim."); *Envirotech,* 730 F.2d at 760 ("The doctrine is usually asserted when literal infringement is not made out."). Since prosecution history estoppel is a limitation on the doctrine of equivalents, the Federal Circuit has held that a finding of literal infringement renders prosecution history estoppel irrelevant. *Fromson,* 720 F.2d at 1571. However, the reverse doctrine of equivalents may serve to limit the scope of the claims. *Graver Tank,* 339 U.S. at 608–09, 70 S.Ct. at 856–57. Thus, any infringement analysis should consider the question of prosecution history estoppel.

have been submitted before remittance of the minimum issue fee. This question brings into focus the contending public policies of certainty and fairness which underlie all doctrine of equivalents questions. Where the patentee did not avail himself of then-available options to correct what he now asserts was a mistake by the examiner, others are entitled to rely upon the scope of the patent as shown in the prosecution history. Plaintiff may not, some twenty years later, recapture by the equitable doctrine of equivalents that which he voluntarily abandoned with the intent of overcoming prior art references.

In his amendment of September 7, 1971, plaintiff added the limitation of an optical fiber source to claim one. The examiner had previously rejected claim one for obviousness. (File Wrapper at 99.) The applicant's remarks accompanying the amendments speak of "the essentiality" of defining the invention in terms of, inter alia, an optical fiber. Whether plaintiff suggested the term "essentially" in that letter or whether he simply recounted a conversation with the examiner is of no moment. In point of fact, he did amend his claim by adding the limitation of an optical fiber source in order to get allowance. He may not now reclaim by equivalents that which he chose to forgo in amendment in order to overcome a prior art reference and secure the issue of his patent.

■ Even more telling is the cancellation of proposed claim fourteen. Plaintiff had added that claim in the September 7, 1971, supplemental amendment. That claim contained the language "passing radiation from a source." Plaintiff attempted, inter alia, to secure patent protection for other than an optical fiber source. The examiner, however, expressly conditioned allowance of the patent on cancellation of proposed claim fourteen. Plaintiff told his prosecution attorney, Mr. Douglas, that he believed proposed claim fourteen to be a broader statement of his invention. (Letter from Judin to Douglas of 9/1/71.) Mr. Judin's attorney explicitly told him that the patent was in trouble because "any source is too broad in view of the specification and

should be limited to—a fiber source—." (Letter from Douglas to Judin of 9/15/71, (emphasis in original).) The letter goes on to relate that plaintiff agreed to cancel proposed claim fourteen as too broad in order to have his other claims allowed.

Similarly, in proposed claim fifteen of the September 7, 1971, supplemental amendment to his application, plaintiff attempted to claim a pinhole source. The prosecution history makes clear that plaintiff cancelled proposed claim fifteen in order to receive his patent. In a September 7, 1971, letter to Mr. Judin, his prosecution attorney warned that "the pinhole source may not be entered." The September 24 letter from the examiner allowing the patent plainly conditioned issuance upon cancellation of the proposed claim including a pinhole source. In the context of this motion, plaintiff has attempted to argue that the optical fiber source is just a pinhole source, and that an LED is another well-known pinhole source. In light of his withdrawal of proposed claim fifteen in order to secure his patent, plaintiff may not now claim all pinhole sources. The prosecution history limits him to optical fiber sources.

■ In determining whether an imputed equivalent satisfies a limitation of the claim, it is useful to employ the tripartite means/function/result analysis for the particular element, as well as the whole claim, *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1326 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992); *Corning,* 868 F.2d at 1260, although that is not the only acceptable means of showing that a claim limitation has a substantial equivalent in the accused device. *Malta,* 952 F.2d at 1326. No component or combination of components in the accused bar code scanners are equivalent to an optical fiber source. The optical fiber source of the claim performs the function of conveying light into the system. It does so by means of internal reflection. It accomplishes the result of illuminating only a portion of the ball lens.

■ The LED is not equivalent to an optical fiber. An LED "converts electronic energy efficiently into spontaneous and

non coherent electromagnetic radiation at visible and near-infrared wavelengths." *McGraw–Hill Dictionary of Scientific and Technical Terms, supra,* at 915. It does so by means of "electroluminescence at a forward biased *pn* junction." *Id.* The result obtained by an LED is illumination of an entire hemisphere. The court concludes that plaintiff has not raised a genuine issue of fact as to the equivalency of an LED to an optical fiber source, in the meaning of that term dictated by the prosecution history.

The combination of the LED and the highly corrected lens in the scanners is not equivalent to an optical fiber source. The LED and the highly corrected lens perform the function of focusing as much light as possible in the accused bar code scanners to a point in order to illuminate the bar code. An optical fiber does not emit a convergent light beam, it does not have a focal point, and it does not serve to collect as much light as possible. The combination of the LED and highly corrected lens perform their function by means of electroluminescence and refraction. The optical fiber source performs its function by means of internal reflection. The result accomplished by the LED and highly corrected lens is a focused point of light. The result accomplished by the optical fiber source is a light beam of limited divergence.

■ Plaintiff is also limited to uncorrected lenses or their equivalents. He may not claim that the highly corrected lens of the accused devices is the equivalent of the uncorrected lens of his claim. The prosecution history also makes clear that plaintiff was only claiming patent protection for the use of an uncorrected lens. Prior art disclosed the use of a corrected lens. Thus, in response to the rejection for obviousness on December 2, 1968, plaintiff pointed out that his invention was different from the prior art in that he used uncorrected lenses. Again in response to the rejection letter of June 17, 1969, plaintiff relied on the fact that his invention used only uncorrected lenses. In distinguishing Palmer when responding to the November 24, 1969, rejection, plaintiff again referred to the fact

that his own invention used uncorrected lenses, as distinguished from the corrected lenses revealed in the prior art. In his remarks accompanying his September 7, 1971, amendment, plaintiff again identified his use of an uncorrected lens as a feature distinguishing him from the prior art. Thus, use of corrected lenses is outside the legitimate scope of equivalents of the claimed invention.

■ Plaintiff contended that the sapphire tip in the accused bar code scanners literally satisfied the limitation of an uncorrected lens. The court has determined that they do not. Additionally, the court finds that the sapphire tips are not equivalent to the uncorrected lens of the '6,832 patent. The sapphire tips do not perform substantially the same function by substantially the same means to achieve substantially the same result as the uncorrected lens of the '6,832 patent.

The uncorrected lens of the patent performs the function of converting a divergent beam of light into a convergent beam of light. The function performed by the sapphire tip in the accused devices is mechanical. They serve to keep out dust, to permit the pen to glide smoothly over the surface to be scanned, and to ensure that the paper is at the point where the light from the LED is brought into focus by the highly corrected lens. The beam of light incident upon the sapphire tip is convergent, not divergent. If the sapphire tip performs any optical function, it is to reduce the rate at which the light incident upon it is converging and thus to move the focal point slightly farther away.

The result obtained by the uncorrected lens of the patent is to produce a convergent beam of light which focuses to a diffraction limited image of the source. No beam of light, either convergent or divergent, emerges from the sapphire tip when the accused device is scanning a bar code. It is at the front of the sapphire tip that the paper reflects the light back into the scanner. If a beam of light did emerge from the front of the sapphire tip, it would be divergent, not convergent. The light is in focus on the front surface of the sap-

phire tip. Beyond this focal point, the light would again be divergent.

The accused devices do not perform substantially the same function as the claimed invention by substantially the same means to obtain the same result. Specifically, the "means" component is not satisfied with respect to the limitations of an "optical fiber source" and an uncorrected lens. The accused devices do not operate by means of an "optical fiber source" within the legitimate scope of equivalents of that term as it is used in the '6,832 patent, nor do they operate by means of an uncorrected lens. Because the accused devices do not contain the equivalent of these elements, they do not infringe the patent under the doctrine of equivalents.

One approach the Federal Circuit has suggested for determining whether a given range of equivalents would be allowable over the prior art is to imagine a hypothetical claim sufficient in scope to literally cover the accused device. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684–85 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). If the examiner would have allowed the hypothetical claim over prior art, then the accused device infringes the patent equivalently. *Id.* at 684.

Plaintiff has proposed the following hypothetical claim:

A method of forming an image in an optical system comprising passing radiation through an optically uncorrected substantially spherical (or plano-convex) lens of an appropriate size and index of refraction, which lens receives incident radiation within a limited beam divergence angle to form a diffraction limited image.

Plaintiff would have us disregard the limitation "optical fiber source." His hypothetical claim makes no mention of the source of radiation. To disregard a limitation of the claim in this manner is not permitted. Application of the doctrine of equivalents may not eliminate specific limitations from a claim. *Perkin–Elmer*, 822 F.2d at 1532–33. As discussed above, the prosecution history of the patent restricts plaintiff to an optical fiber source. Plaintiff may not employ a hypothetical claim that eliminates the requirement of an optical fiber source when he voluntarily cancelled a claim devoid of that requirement in order to overcome an obviousness objection and have his patent issued.

Nor would plaintiff's proposed hypothetical claim have been allowed. Plaintiff has attempted to recapture material that the examiner specifically refused to allow. Although the legitimate range of equivalents for "optical fiber source" may encompass more than light pipes and may well include ribbons or waveguides of other geometries, it does not include all pinhole sources and does not include the LED employed in these wands. This accused device is not within the legitimate scope of equivalents to the claims.

It is worth noting that even if plaintiff's hypothetical claim were allowed, the accused bar code scanners would not infringe. In the hypothetical claim the uncorrected lens receives radiation "within a limited beam divergence angle." The light incident upon the sapphire tip of these wands is not divergent, it is convergent and would therefore fall outside of even this overbroad proposal plaintiff has advanced as the scope of equivalency.

b. Wands with a Plano–Convex Tip.

Plaintiff contends that these wands literally infringe claim eight of his patent. They do not. There is no optical fiber source as required by claim eight. The light source in these wands is an LED. The light does not pass through optical fibers. An LED is not an optical fiber, and no component of the accused devices satisfies that limitation. Lacking this element, claim eight is not literally infringed.

Additionally, the sapphire tip in these wands is not a converging lens, just as the ball tip in the wands discussed previously is not a lens. The analysis is substantially the same and need not be repeated here. In the context of the plano convex optical elements, however, it is important to note that plaintiff concedes the flat back surface

has no optical power. Since, as with the substantially spherical tips, the light is not refracted by passing through the front of the lens but is instead reflected at that point by the paper back to the detector, the plano-convex sapphire tip is not a lens. Its function is, as HP asserts, mechanical. It seals out dust and keeps the paper being scanned at the position where the highly corrected collecting lens within the wand focuses the beam of light. No component of the accused device meets the limitation of an uncorrected converging lens. Because the accused devices do not include such a component, they do not literally infringe claim eight.

■ The analysis under the doctrine of equivalents for this claim is also substantially the same as that employed for claims one and ten. Plaintiff may not now gain by application of the doctrine of equivalents what he was not allowed in prosecuting his patent. The LED in these wands is outside the legitimate scope of equivalents of the claimed optical fiber source. Also, the wands do not contain the equivalent of an uncorrected lens. Therefore, the accused devices do not infringe the patent under the doctrine of equivalents.

### c. Optical Transmitters.

■ These devices do contain an optical fiber. However, the optical fiber is not the source of the radiation. Rather, light passes from the lens to the optical fiber. The source of light in the transmitters is an unmasked LED. As per the analysis with respect to the scanning wands above, an LED is neither a literal optical fiber source nor is it equivalent to that limitation of the claims. These transmitters do not infringe the patent.

### d. Optical Receivers.

■ Unlike the other devices, in the optical receivers the light does enter the system from an optical fiber. The light emerges from the fiber, shines upon a sapphire ball, and is brought into focus on a photodetector. With respect to this device, plaintiff has at least raised sufficient issues of fact to preclude summary judg-

ment. Unlike the tip in the wands, the sapphire sphere in the receivers does in fact function as a lens. Unlike both the wands and the transmitters, the source of light to the system is an optical fiber. Defendant's principal argument with respect to these devices is that the ball lens is too close to the optical fiber. The court, however, is not prepared to hold that as a matter of law, a 2.47mm separation distance from a sapphire ball is not the same as or equivalent to about 3mm or more separation distance from a glass bead.

### CONCLUSION

With respect to the wands described herein, defendant's motion for summary judgment on the issue of non-infringement is GRANTED. These devices do not contain an optical fiber source or its equivalent and the sapphire tips to these wands do not serve as lenses. With respect to the optical communications transmitters, the motion for summary judgment of non-infringement is GRANTED. These devices do not contain an optical fiber source or its equivalent. With respect to the optical communications receivers, the motion is DENIED. Defendant has not proven that no genuine issues of material fact exist with respect to the infringement of the patent in issue by these devices.

The parties are directed to file a status report, joint if possible, addressing the question of which parties may be dismissed from this action in light of this opinion and proposing further discovery, dispositive motions, or other pretrial procedures along with deadlines. The report will be filed on or before March 12, 1993.